IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,216

STATE OF KANSAS,
*Appellee*,

v.

Z.M.,
*Appellant*.

SYLLABUS BY THE COURT

1.

A statement by counsel outlining the facts underlying an alleged conflict of interest with their client does not create a conflict of interest, but it may illuminate an existing one.

2.

There is no requirement that each discussion of aiding and abetting must include every aspect of the doctrine. It is not legal error to discuss the doctrine's various aspects separately so long as the jury is not confused or misled.

3.

The phrase "mental culpability" in an aiding and abetting jury instruction based on K.S.A. 21-5210(a) is readily comprehensible and does not need additional explanation or definition.

4.

A district court should instruct the jury on how it may reach a unanimous verdict when a defendant is charged with a single crime of first-degree murder that is charged under the alternative theories of premeditated murder and felony murder.

Appeal from Shawnee District Court; DAVID B. DEBENHAM, judge. Oral argument held November 3, 2023. Opinion filed August 30, 2024. Affirmed.

*Jennifer C. Roth,* of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jodi Litfin*, deputy district attorney, argued the cause, and *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: A jury convicted Z.M. of premeditated first-degree murder, first-degree felony murder, and criminal discharge of a firearm at an occupied vehicle. The charges arose from an incident in 2019 where Z.M. drove a vehicle from which a passenger shot at a second car. The driver of the second car, J.M., was killed. The court sentenced Z.M. to a controlling hard 50 life sentence for his crimes.

On direct appeal, Z.M. alleges five errors:

(1) The district court erred by denying his request for new counsel.

(2) Trial counsel abandoned him at sentencing, in violation of Z.M.'s constitutional right to be represented by counsel.

(3) During voir dire and closing arguments the prosecutor misstated the law of aiding and abetting liability, premeditation, and first-degree murder.

(4) The jury was provided legally inappropriate jury instructions and verdict forms on first-degree murder, its lesser included offense, and aiding and abetting.

(5) The errors asserted in issues three and four cumulatively denied Z.M. a fair trial.

We agree the jury was not properly instructed on Z.M.'s murder charges, but conclude this was harmless. We affirm his convictions and sentence.

FACTS AND PROCEDURAL HISTORY

On a July afternoon in 2019, Z.M. drove his blue Pontiac G6 east on SE 37th Street in Topeka. He was chasing a white Grand Marquis driven by J.M., who had three passengers in the car with him. Z.M. had two passengers: D.W. and L.J. When the Pontiac caught up to the Marquis, one of Z.M.'s passengers sat on his windowsill and, from the roof of the Pontiac, fired rounds from his rifle toward the Marquis.

The Marquis immediately slowed and ran off the road. J.M.'s passengers ran. The Pontiac drove away. When the dust cleared, J.M. was found by witnesses at the scene, still sitting in the driver's seat of the Marquis. He had a gunshot wound to the head and a handgun in his lap. J.M. was taken to the hospital, where he died.

From the area of the crash, law enforcement found shell casings, including 9-millimeter casings, 7.62 rifle casings, .380 casings, and .45 caliber casings. They also found the Pontiac. Inside it were Z.M.'s driver's license and wallet.

Law enforcement executed a search warrant at D.W.'s home and found a rifle that matched the casings at the crime scene. D.W.'s DNA matched DNA found on the rifle. Officers also found a 9-millimeter magazine at the home where D.W. was arrested,

3

though a 9-millimeter handgun was never recovered. One witness identified L.J. as the individual shooting the rifle, and L.J. was arrested in Arkansas. Z.M. turned himself in.

The State charged Z.M. in juvenile court. Shortly after, the case was moved to adult court, where Z.M. was charged with one count of first-degree premeditated murder, one count of first-degree felony murder, and one count of criminal discharge of a firearm at an occupied vehicle resulting in great bodily harm. Z.M. pleaded not guilty to all charges.

Before trial, Z.M.'s counsel filed a Motion to Determine Competency to Stand Trial and a Motion to Withdraw. The court granted the former, found Z.M. competent, and denied the latter.

The jury trial began in March 2020. The State presented 34 witnesses. Z.M. did not present any. The State proceeded on a theory of aiding and abetting liability. The jury found Z.M. guilty on all counts.

The court sentenced Z.M. to a hard 50 life sentence for the premeditated first-degree murder conviction and 94 months for criminal discharge of a weapon at an occupied vehicle resulting in great bodily harm. The court ordered the sentences to run concurrent.

Z.M. directly appeals. See K.S.A. 22-3601(b)(3) (direct appeals to Supreme Court allowed for life sentence crimes); K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601).

ANALYSIS

I.  *The district court did not err when it denied Z.M.'s request for new counsel.*

Z.M. argues the district court erred by inadequately investigating Z.M.'s asserted conflict of interest and failing to appoint substitute counsel.

*Standard of Review*

An appellate court reviews both the adequacy of a district court's inquiry into a potential conflict and its ultimate decision on a motion for new counsel for abuse of discretion. *State v. Pfannenstiel*, 302 Kan. 747, 760-62, 357 P.3d 877 (2015).

> "An abuse of discretion can occur if judicial action is (1) arbitrary, fanciful, or unreasonable, i.e., no reasonable person would take the view adopted by the trial court; (2) based on an error of law, i.e., the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, i.e., substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Pfannenstiel*, 302 Kan. at 760.

*Additional Facts*

Z.M.'s first appointed counsel, Michael Francis, represented him in juvenile court but no longer represented Z.M. after the district court authorized prosecution as an adult. Z.M.'s first appointed counsel in adult court withdrew because of a conflict. The district court then appointed James Chappas to represent Z.M.

Chappas represented Z.M. at a joint preliminary hearing that included two other defendants. Circumstantial evidence suggested Z.M. was the driver of the blue Pontiac,

and some testimony also suggested someone fired a handgun from the driver's side. Further, J.P.—one of the passengers in J.M.'s white Grand Marquis—testified there was supposed to be a fight involving Z.M. at Betty Phillips Park on the day of the shooting.

A few months after the preliminary hearing, Chappas filed both a Motion to Determine Competency to Stand Trial and a Motion to Withdraw. In the Motion to Determine Competency, Chappas wrote that Z.M. "cannot sustain a coherent discussion about the facts of the case or any applicable defenses," that his recent discussions with Z.M. "consisted of [Z.M.'s] repeated assertion that God would vindicate him at trial," and that Z.M. exhibited an abnormal comfort with being incarcerated. In the Motion to Withdraw, Chappas wrote only that Z.M. had directed him to file the motion.

At the motions hearing, Z.M. apparently gave the district court a letter, although the letter does not appear in the record and the contents are not discussed specifically. Chappas also presented several concerns:

> "[N]umber one, he's a minor. Second . . . I have concerns with . . . [Z.M.'s] cognitive ability to fully understand and appreciate the controlling facts in his particular case. I have a concern with his ability to appreciate the relevance and the application of those facts to the State's theory of prosecution in the case. Specifically . . . concerning [Z.M.'s] appreciation of the relevancy and the significance of those facts related to the theory of prosecution that's been forwarded by the State and how that all relates to his ability to assist his attorney, his ability to understand and appreciate any formulated defenses, his ability to actually assist his attorney in the defense of his case. And . . . in effect, what I've seen is a lack of ability for him to appreciate all of those things and an inability to make . . . any sound decisions in terms of how to proceed in this particular case, how to interact with his lawyer in the terms of formulation of defenses."

Chappas told the district court that he had not provided Z.M. with "the paper discovery" but had "advis[ed] the client of the State's theory of the case and all of the

facts that are alleged." Chappas told the court that he would send the reports to Z.M. after appropriately redacting them.

The district court told the parties that it would take up the Motion to Withdraw after it ruled on Z.M.'s competency. It then ordered a competency evaluation, which was to be performed by Dr. David Blakely. Toward the end of the hearing, Z.M. addressed the court:

"Your Honor, I apologize for taking your time. Your Honor, I have been in custody since July 27th of 2019. I still do not have my discovery. I still have not had a fit. The entire relation, my attorney has only been to see me for—

. . . .

". . . My attorney has only been to see me four times. He represented me. He represented a witness in my cousin's murder trial. I personally believe that is a conflict of interest in my case.

"He has told me he hates jury trials. They scare him, and they are long, and that I need to take a plea, and that included protective custody, out-of-state, when I addressed Mr. Chappas with my defense and as he asked me what he [*sic*] should say on the stand.

"The last time I seen Mr. Chappas, I told him I wanted a new attorney, and he was fired. He respond with 'You're a dumb—sorry for my language—ass, and will spend the rest of your life in prison.'

"Your Honor, please appoint me a new attorney."

Dr. Blakely evaluated Z.M. and produced a report. In it, Dr. Blakely wrote:

"[Z.M.] understands the roles of the various Court officers. He understands that a lawyer is supposed to 'defend me', 'help me through the case', 'prove I'm not guilty', and he adds

'not call me a dumbass'. He says the lawyer called him that as he was leaving. The patient had told the lawyer that he did not want this lawyer anymore; he wants to switch lawyers and that was the occasion of the comment that the patient is claiming. He also adds the lawyer is supposed to 'make a case for me, believe in me'. . . . He does say that they say big words in Court. He does not always understand all of them. He feels that Mr. Chappas 'has not done anything for me'. He has only seen him three times, and he has been here 'seven months'. He says that he did say 'I hope that God will help me'; 'I hope the judge will help me.'

. . . .

"The first problem is competence, and while this patient does hear some voices and he has some learning disability he also has a serious substance abuse problem. Today he is clearly competent. He clearly understands the charges. He does not like his lawyer; there is a problem going on there it sounds like. It may come out of misinformation or it may come out of not understanding, but it does not come out of psychosis as I see him today. He understands the charges, and if he gets the right lawyer or irons things out with this lawyer, he can help in his own defense.

. . . .

"This is a young man with a serious drug use problem, some antisocial behavior who is falling into with 'the wrong crowd', a history of ADHD, and now he still hears some voices. But, he clearly understands the charges and can help in his own defense and is, therefore, competent to stand trial."

The Blakely report was addressed at the competency hearing. Chappas did not object to Dr. Blakely's finding that Z.M. was competent, but he did object to Dr. Blakely's notation that Chappas called Z.M. a derogatory name. The report was admitted as evidence. No witnesses were called. After hearing statements from counsel, the district court found Z.M. competent to stand trial.

The district court then took up Chappas' Motion to Withdraw in an in-camera hearing with just Z.M. and Chappas present. Z.M. began by telling the court about Chappas' representation of "Mandy," a witness in the trial of his cousin's killer. Z.M. believed "Mandy" was also charged with his cousin's murder, but he was not certain. He also believed this was a conflict of interest because "she was there during the murder which everybody says she set it up."

Z.M. next claimed that:

"[Chappas has] only been up to see me three times, I have not received my discovery, he was begging, and begging, and begging, and begging, telling me to take this plea which I do not want to take. . . . [H]e said he does not like jury trials, which I said, 'Okay, but I want to take it to the jury.' He was like, 'All right,' but then he kept on begging me to take the plea. After that—after that visit he never came up, not once."

Z.M. also told the court that Chappas had not shown him the police reports or discussed the case's facts except "that the—the DA is trying to accuse me of driving the vehicle. That's all he's told me."

After deducing that Z.M.'s complaints were limited to his belief that Chappas had a "conflict" because he represented "Mandy" and Chappas' lack of communication, the district court turned to Chappas for response. Chappas clarified that he represented Mandy Zechel as a material witness in Z.M.'s cousin's homicide. Zechel had not been charged with Z.M.'s cousin's killing; he was appointed to represent her because she kept evading the State's efforts to serve her with a subpoena. Zechel testified for the State, not the defense. Chappas told the court the only conversation he had with Z.M. on the matter was to say, "'Oh okay, that was your cousin? I didn't know that.'" The district court then said to Chappas: "It seems to me from what you told me and [Z.M.]'s told me on this issue that there is no conflict." Chappas responded: "I can't—I can't see one."

9

The court then asked Chappas to address Z.M.'s second complaint: failure to provide discovery and generally communicate with him. Chappas explained that Francis originally represented Z.M. in juvenile court before the transfer to adult court. Chappas spoke to Francis about Z.M.'s case and learned Francis had had "extensive discussion with [Z.M.] about the alleged offense conduct." Chappas then said he had "at least three if not four meetings" with Z.M., and had:

> "extensive discussion with him about the State's theory of the prosecution of the case, meaning the charges. We have talked extensively about the penalties associated with that. And although I have not sat down and provided him with the actual police reports, but I've had extensive discussion with him about all of the factual allegations that are made by the State, who's making them, and—and how they are alleged to be part of the offense conduct in the case."

Chappas also claimed he had at least three "very extensive" meetings with Z.M.'s parents where they discussed the same things. He explained Z.M. was present at the preliminary hearing, asked Chappas questions during the hearing, and discussed the testimony with Chappas. He then outlined the things he talks about with every client, including "all of the facts that the State alleges that constitutes the offense conduct." He then said:

> "We had extensive discussion about the—the car chase that was involved, the fact that AMR was there, that they took a video, that the . . . that all this was bolstered by the testimony that later occurred at the preliminary hearing. The witness statements, [Z.M.] heard witnesses that had him behind the wheel of the car, had him shooting a firearm out the driver's side of the car. There was witness testimony also that during this chase, [Z.M.] was on the phone—at some point in time was on the phone with his brother making comments about chasing them, ang [*sic*] getting them, and things along those lines. *Those facts were discussed with [Z.M.] in excruciating detail*." (Emphasis added.)

10

Chappas told the court that he had talked about aiding and abetting liability and claimed that "[Z.M.] understood that when we had that discussion." He also told Z.M. about the jury trial process, his own role as a "facilitator of the information" and as a legal counselor, the possibility of defenses, the nature of plea negotiations, and his own opinion about the likely outcomes of trial. Chappas told Z.M. that "in all likelihood a jury would, at a minimum, come back and convict him of the felony murder" because "they've got a picture of his co-defendant hanging out the driver's side of the window with a rifle shooting at the car in front of him and that resulted in the driver being killed by a bullet from that rifle. They had [Z.M.] driving it." After Chappas suggested that Z.M. take a plea based on those facts, Z.M.—after reflection—told Chappas, "'I thought you were here for me. God's gonna set this right, I'm going to trial, I'm not doing any plea.'" Chappas claimed he never "begged" Z.M. to take a plea.

Finally, Chappas denied calling Z.M. a "dumbass," claiming he does not "berate clients" or "tell them what to do." He then went on:

> "[A]nd quite frankly, I find his offense to the term, 'Dumbass,' almost comical in—in—in that, you know, coming from an individual who's almost every other word is, 'F this, F that.' So Judge . . . you layer on top of this the standard, there is no—as an officer of the court, if the Court's question to me is if you have an opinion as to whether there's a basis under the law to justify my removal as counsel and my answer is no. I'm ready to proceed, but that decision is yours."

After Chappas finished, the court turned again to Z.M. for any reply. Z.M. offered nothing more, and the judge asked no more questions. The district court then denied the Motion to Withdraw:

> "What I find in this case is the defendant is being represented by competent counsel, that counsel has provided discovery, analysis, suggestions, his take on the case, has gone over

11

the evidence in this case, besides which the defendant had a full hearing in juvenile court before he was waived upwards as part of the waiver. He had a full preliminary hearing— evidentiary preliminary hearing in this case. I adopt the findings—the statements made by Mr. Chappas of his representation and I find the defendant has not met his burden in this case the [*sic*] show that there is a conflict as—as a valid reason for the appointment of new counsel in this case, that his dissatisfaction with Mr. Chappas is unjustified."

*Discussion*

The Sixth Amendment to the United States Constitution guarantees Z.M. a right to effective assistance of counsel during all critical stages of the criminal proceeding. *Pfannenstiel*, 302 Kan. at 758. "[A] request for new counsel is largely premised on the principle that the Sixth Amendment does 'not guarantee the defendant the right to choose which attorney will be appointed to represent the defendant.' Because the right to choose counsel is not absolute, it necessarily follows that a defendant does not have an absolute right to substitute counsel." 302 Kan. at 759.

A defendant who seeks the appointment of new counsel must show "justifiable dissatisfaction" with current appointed counsel before substitute counsel is appointed. *Pfannenstiel*, 302 Kan. at 759. They can do this by showing "a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication." *State v. Brown*, 305 Kan. 413, 424, 382 P.3d 852 (2016). By making "an articulated statement of attorney dissatisfaction," a defendant "'trigger[s] the district court's duty to inquire into a potential conflict of interest.'" *Pfannenstiel*, 302 Kan. at 760 (quoting *State v. Brown*, 300 Kan. 565, 575, 331 P.3d 797 [2014]).

When presented with a potential conflict of interest, a district court can err in three ways: (1) by simply failing to conduct an inquiry at all, (2) by failing to conduct an "appropriate inquiry," and (3) by incorrectly deciding whether to substitute counsel.

*Pfannenstiel*, 302 Kan. at 760-62. "An appropriate inquiry requires fully investigating (1) the basis for the defendant's dissatisfaction with counsel and (2) the facts necessary for determining if that dissatisfaction warrants appointing new counsel, that is, if the dissatisfaction is 'justifiable.'" 302 Kan. at 761. Still,

> "this inquiry does not require 'a detailed examination of every nuance of a defendant's claim of inadequacy of defense and conflict of interest.' Instead, 'A single, open-ended question by the trial court may suffice if it provides the defendant with the opportunity to explain a conflict of interest, an irreconcilable disagreement, or an inability to communicate with counsel.' [Citations omitted.]" *State v. Toothman*, 310 Kan. 542, 554, 448 P.3d 1039 (2019).

A "conflict of interest" is defined as:

> "1. A real or seeming incompatibility between one's private interests and one's public or fiduciary duties. 2. A real or seeming incompatibility between the interests of two of a lawyer's clients, such that the lawyer is disqualified from representing both clients if the dual representation adversely affects either client or if the clients do not consent." Black's Law Dictionary 374 (11th ed. 2019).

"A conflict of interest (or the lack of one) exists independent of the district court's inquiry, and the lack of an inquiry does not, in itself, work a Sixth Amendment violation." *State v. Prado*, 299 Kan. 1251, 1264, 329 P.3d 473 (2014) (Biles, J., dissenting). See *Mickens v. Taylor,* 535 U.S. 162, 173-74, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

Here, the focus of the court's inquiry into whether Chappas had an actual or potential conflict of interest was necessarily directed to Chappas. First, were Chappas' private interests as alleged by Z.M. (Chappas hates jury trials, they scare him, they are long and so Z.M. needs to take a plea) incompatible with his fiduciary duty to Z.M.?

13

Second, was there a real or seeming incompatibility between the interests of Z.M. and someone else represented by Chappas?

Z.M.'s request for new counsel put the district court on notice of a potential conflict of interest, and therefore triggered the court's duty to investigate. The district court did not fail to inquire. But Z.M. claims the district court's inquiry was not appropriate because it was inadequate. He also asserts the district court abused its discretion by refusing to appoint substitute counsel.

*The district court's investigation was appropriate.*

Z.M. first argues the scope of the court's investigation was too narrow. He criticizes the district court for failing to "ask [Z.M.] about things in Dr. Blakely's report—the one it had used minutes before to find [Z.M.] competent" and for failing to "ask the attorney what he had done to address his own concerns or the ones Dr. Blakely identified during the evaluation the attorney requested and the court ordered." Z.M.'s complaints partially center on competency issues related to his youth and learning disability—although he does not assert the district court erroneously concluded Z.M. was competent to stand trial. Instead, his core complaint seems to be that the district court overlooked how Z.M.'s cognitive abilities, age, and development impacted his relationship with Chappas.

While Z.M. aptly references some apparent disconnect between Chappas' arguments in support of the competency motion and Chappas' statements about his own representation, we do not find Z.M.'s criticism of the court persuasive. The district court had *just found* Z.M. competent, based on the contents of the competency evaluation report, when it took up Z.M.'s counsel's motion to withdraw. It is unlikely the district

14

court simply forgot about the concerns stated by Z.M. or concluded by Dr. Blakely in that report, including Z.M.'s assertion that Chappas called him a "dumbass."

Z.M. cites references in Blakely's report to Z.M.'s youth and "learning disability," but fails to show how his youth and learning disability, by themselves, presented "a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication." While these factors may increase the *difficulty* of communication or the *risk* of irreconcilable disagreement, their existence is not shown to *create* either automatically. Consequently, the district court did not abuse its discretion by failing to ask specifically about the lack of "special accommodations" Chappas made for Z.M. or, more generally, about the way Z.M.'s cognitive difficulties and age impacted his working relationship with Chappas.

"A court is not required to engage in a detailed examination of every nuance of a defendant's claim of inadequacy of defense and conflict of interest." *State v. Staten*, 304 Kan. 957, 972, 377 P.3d 427 (2016). Instead, by focusing its questions on the issues *Z.M.* presented, the district court reasonably tailored its inquiry to the issues actually before it—not those that *might* have become pertinent under a reopened competency inquiry. Thus, the district court did not err by confining its investigation to the two bases Z.M. advanced at the time of the hearing.

The court also adequately investigated the issues Z.M. presented. Z.M.'s first complaint at the motion hearing lay in Chappas' representation of "Mandy," fearing Chappas was also assisting someone involved in killing his cousin. Most of the district court's specific questions to Z.M. centered on who "Mandy" was and why Z.M. felt the representation posed a conflict. Chappas clarified that "Mandy" was *not* a witness for the defense of his cousin's accused killer, as Z.M. thought, but was a witness for the State and required counsel because she had been jailed for failing to comply with subpoenas to

15

appear for hearings. Thus, the district court's investigation was adequate to obtain the facts necessary to determine whether "Mandy" created a conflict of interest.

Z.M.'s second complaint at the hearing was that Chappas failed to communicate with him about discovery, and in particular had not provided him with written discovery. Although the judge asked Chappas only one open-ended question—"Could you address his second complaint?"—Chappas responded to that general question at length, admitting his failure to provide Z.M. with the written police reports, recounting discussions he had with Z.M. regarding the State's theory, and giving the reasons behind his suggestion that Z.M. should take a plea. The court's investigation was appropriate because it allowed the district court to understand the basis for Z.M.'s claim of dissatisfaction and the facts surrounding his communications with Chappas about the discovery in his case.

Beyond his complaints expressed during the motion hearing, Z.M. further asserts that two of Chappas' statements during the hearing *created* a conflict of interest, thereby requiring the court to inquire into a potential conflict of interest. See *Pfannenstiel*, 302 Kan. at 766; *Prado*, 299 Kan. at 1259. The first statement responded to the district court's observation that Chappas' representation of "Mandy" posed no conflict. Chappas agreed, stating "I can't see one." The second statement was after Chappas' extended remarks about his communications with and representation of Z.M., when he stated, "So, Judge . . . if the Court's question to me is . . . whether there's a basis under the law to justify my removal as counsel and my answer is no."

As Z.M. reminds us: "[T]he inquiry into whether a defendant has demonstrated justifiable dissatisfaction with his attorney requires both the court and defense counsel to walk a delicate line in making the inquiry." *Pfannenstiel*, 302 Kan. at 766. During this inquiry, the district court "must explore the basis of the alleged conflict of interest 'without improperly requiring disclosure of the confidential communications of the

16

client.' Moreover, other courts draw a meaningful distinction between (1) an attorney truthfully recounting facts and (2) an attorney going beyond factual statements and advocating against the client's position." 302 Kan. at 766. Under *Prado*, Chappas' statements arguably "alerted" the district court to the existence of a conflict, which would have prompted the district court "to inquire as to the nature of the conflict." *Prado*, 299 Kan. at 1259. But the district court was already *doing* that. The focus here is whether these two statements indicated a conflict of interest that "adversely affect[ed] counsel's performance." *Prado*, 299 Kan. at 1266-67 (Biles, J., dissenting).

We conclude these statements did not indicate a conflict of interest between Z.M. and his counsel affecting counsel's advocacy for Z.M. The first comment merely agreed with the court's previously articulated conclusion that Chappas' representation of "Mandy" created no conflict of interest. Chappas' second comment addressed Z.M.'s complaint—and the court's inquiry—about the nature and extent of Chappas' allegedly inadequate communication with Z.M. The court's inquiry on this issue, and the testimony of both Z.M. and Chappas, addressed the facts underlying that complaint. While Z.M. thought the communication was insufficient and Chappas' second comment indicates Chappas thought the communication was sufficient, their *opinions* on the sufficiency of their communications did not create a conflict of interest because their opinions did not change the facts that pre-existed the hearing, or the strength of Chappas' loyalty to Z.M., or the ability of Chappas to advocate for Z.M. See *Pfannenstiel*, 302 Kan. at 770 (Biles, J., concurring in part) ("Prado's counsel's statement that he '"didn't see a conflict"' also merely expressed an independent professional judgment about whether he had perceived prior to the hearing any duty to withdraw based on his relationship with his client."). Thus, when considered in context, Chappas' second comment did not cross the line into advocating against Z.M. Accordingly, the court discharged its duty to inquire into a potential conflict.

*The district court did not abuse its discretion in refusing to appoint substitute counsel.*

Next, Z.M. also challenges the district court's decision not to permit Chappas to withdraw and to appoint new counsel. We conclude the district court did not abuse its discretion by finding Z.M.'s two claims did not require appointment of substitute counsel. The record supports the district court's implicit conclusions that there was no conflict of interest stemming from Chappas' representation of "Mandy" and no irreconcilable disagreement or complete breakdown in Chappas' relationship with Z.M. More specifically, we agree that Chappas' representation of "Mandy" was not incompatible with his representation of Z.M. And we agree Z.M.'s suggestion that Chappas failed to communicate does not rise to the level of justifiable dissatisfaction. Chappas recounted his preparation with Z.M., which included discussions about the evidence, the State's theory, and possible defenses. Chappas and Z.M. disagreed about how to proceed based on their assessment of the evidence—which, Chappas claimed, he fully explained to Z.M.—but Chappas took the matter to trial anyway, as Z.M. requested.

Still, one potential error warrants attention. The district court concluded that Chappas provided Z.M. with "discovery," but Chappas himself admitted he had not yet given Z.M. any written reports. Z.M. highlights this discrepancy as an error of fact by the district court. But Chappas also represented that he had discussed the facts with Z.M. extensively. And in the earlier pretrial hearing, Chappas told the district court that "what I define as discovery is advising the client of the State's theory of the case and all of the facts that are alleged." The district court agreed that "discovery can be actually providing your client with written reports or passing that information on" and that "some counsel are . . . hesitant about sending over paper reports, because other individuals in jail can get hold of that."

18

Given Chappas' repeated representation that he had discussed the police reports and other discovery extensively with Z.M.—and Z.M.'s presence at both the hearing on the motion to authorize adult prosecution and the "close to a day"-long preliminary hearing—we conclude the district court did not err in finding that Chappas had presented Z.M. with "discovery."

Finally, Z.M. urges us to find the competency report is evidence of irreconcilable differences between himself and counsel which the court unreasonably ignored. Dr. Blakely noted that Z.M. "does not like his lawyer; there is a problem going on there it sounds like" and that Z.M. "understands the charges, and if he gets the right lawyer or irons things out with this lawyer, he can help in his own defense."

But "'[t]he focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney.'" *Staten*, 304 Kan. at 972 (quoting *United States v. Baisden*, 713 F.3d 450, 454 [8th Cir. 2013]). While it is true Dr. Blakely's report suggests problems in Z.M.'s *relationship* with Chappas, it does not show a conflict of interest, irreconcilable differences, or a complete breakdown in communications. Dr. Blakely reported Z.M.'s complaints that Chappas had "'not done anything for me'" and had "only seen him three times," but those complaints were not explored or endorsed by Dr. Blakely. They were explored during the motions hearing, when Chappas admitted he had only met with Z.M. three or four times. Chappas also spoke at length about his communications with Z.M. during those meetings, and the district court had the discretion to gauge Chappas' credibility.

Ultimately, we conclude the district court did not abuse its discretion by finding Z.M.'s claims did not require appointment of substitute counsel. The record supports the district court's implicit findings of fact and legal conclusions that there was no conflict of interest stemming from Chappas' representation of "Mandy" and no irreconcilable

19

disagreement or complete breakdown in Chappas' communication with Z.M. The court's holding was reasonable.

II.    *Counsel did not fail to function as Z.M.'s advocate at sentencing.*

Z.M. next argues trial counsel failed so completely to function as his advocate at sentencing that prejudice should be presumed under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

*Standard of Review*

Should we reach the merits of this claimed error, Z.M.'s argument implicates his constitutional right to counsel, which we review de novo. *State v. Robinson*, 303 Kan. 11, 85, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017).

*Preservation*

The State argues this issue is not preserved for review because Z.M. did not raise the issue before the district court. Though the State is correct, we have previously exercised our discretion to review an unpreserved constitutional argument in three circumstances:

> "(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) (quoting *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 [2010]).

Here, we choose to reach Z.M.'s argument because it implicates Z.M.'s fundamental right to counsel and is a case-dispositive question of law based on undisputed facts. See *State v. Carter,* 270 Kan. 426, 14 P.3d 1138 (2000) (reaching a *Cronic* claim because the record on appeal could enable meaningful review of the claim).

*Additional Facts*

At sentencing, the State presented testimony from J.M.'s mother. Z.M. did not present any witnesses. In closing, the State asked the court to sentence Z.M. to a life sentence for both the premeditated first-degree murder conviction and the first-degree felony murder conviction. The court then interrupted and asked the parties whether doing so was appropriate. Since there were two first-degree murder convictions for a single killing, the court suggested sentencing Z.M. for both convictions would be multiplicitous. When asked his position, Chappas agreed doing so would violate our caselaw. (The court did not impose a sentence for the felony murder conviction.)

Resuming its closing arguments, the State asked the court to run the sentences for Z.M.'s remaining convictions consecutive. When it was Z.M.'s turn, counsel explained Z.M. was young, knew the victim, observed the preliminary hearing and trial, and received legal advice from counsel. Counsel asked the court to run Z.M.'s sentences concurrent, given Z.M.'s youth and that he was not the shooter. Counsel reminded the court that a 50-year sentence carries no good time and concurrent sentences would give Z.M. some opportunity to realize what he needs to do with the rest of his life.

But counsel also said:

"Notwithstanding all of that, Judge, I'm at a loss to in good faith present to the Court something positive that I can say about my client. Throughout the course of this proceeding, he's exhibited no remorse, no repentance, no acceptance of his criminal

21

action, no acknowledgement of the life that in fact was taken. Although, Judge, he was not the shooter, the criminal action that he was involved with was overwhelming. The jury did not take much time to come back with a verdict in this particular case. And as I've related to the Court, usually in these cases, we have something positive we can say about our clients, and I'm at a loss for anything to say positive about [Z.M]. In fact, and I'll relay it to the Court, and the Court knows this, he wrote a song while he's been in custody about the taking of this young man's life."

The court ordered concurrent sentences.

*Discussion*

The Sixth Amendment to the United States Constitution does not simply guarantee a criminal defendant the right to assistance of counsel during critical stages. It guarantees the right to *effective* assistance of counsel. *State v. Cheatham*, 296 Kan. 417, 429-30, 292 P.3d 318 (2013). In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Court announced the well-known two-part test for a claim of ineffective assistance of counsel:  deficient performance and prejudice. *Strickland*, 466 U.S. at 687. The party claiming ineffective assistance of counsel under *Strickland* has the burden to prove both parts of the test. *Cheatham*, 296 Kan. at 431-32.

Released the same day as *Strickland*, *Cronic* explained that in limited circumstances the deficient performance of counsel is so egregious a showing of prejudice is presumed. *Cronic*, 466 U.S. at 658-60; see also *State v. Edgar*, 294 Kan. 828, 837-40, 283 P.3d 152 (2012) (explaining the interrelationship between *Strickland* and *Cronic*). In *State v. McDaniel*, 306 Kan. 595, 607-08, 395 P.3d 429 (2017), we outlined three categories of ineffective assistance of counsel claims. A defendant may (1) argue their attorney performed deficiently under *Strickland*; (2) invoke the *Cronic* exception; or (3) argue their attorney represented conflicting interests. 306 Kan. at 607-08. On appeal,

22

Z.M. relies exclusively on the second category. He explains: "To be clear, at this stage, [Z.M.] is deliberately raising a *Cronic* issue only as to his counsel's performance at sentencing." He does not assert a *Strickland* claim.

Cronic was charged with committing mail fraud. The Government's investigation took four and a half years, and the defendant's appointed counsel, who was a real estate lawyer, had only 25 days to prepare. The 10th Circuit found the defendant's counsel was ineffective, but on review, the United States Supreme Court reversed, finding the circuit court's analysis insufficient. The high Court began by "recognizing that the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *Cronic*, 466 U.S. at 658. However, the Supreme Court found there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658. It explained prejudice could be presumed in three circumstances: (1) when there is a "complete denial of counsel" at a critical stage; (2) when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) if it would not be possible for a competent lawyer to provide effective assistance. *Cronic*, 466 U.S. at 659-60. The Court concluded Cronic did *not* establish any of these circumstances and that to prevail Cronic needed to identify specific errors made by counsel and demonstrate the effect such errors had on the reliability of the trial process, which could be done on remand.

So our inquiry must focus on whether Z.M.'s counsel's performance falls within one of the circumstances articulated in *Cronic*. Because Z.M. limits his argument to counsel's performance at sentencing, we characterize his claim as falling within the first *Cronic* circumstance: the complete denial of counsel at a critical stage. See *Lafler v. Cooper*, 556 U.S. 156, 165, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) (sentencing is a

critical stage); *Mempa v. Rhay*, 389 U.S. 128, 134, 88 S. Ct. 254, 19 L. Ed. 2d 336 (1967) (same); *Pfannenstiel*, 302 Kan. at 758 (same); *Phillips v. White*, 851 F.3d 567, 580 (6th Cir. 2017) ("For *Cronic* prejudice to apply, petitioner must be deprived of counsel during a critical stage of trial, such as sentencing.").

Z.M. asserts he was completely denied counsel at sentencing for the following reasons: (1) counsel did not file a departure motion; (2) counsel did not make mitigation arguments; (3) counsel referenced incriminating rap lyrics Z.M. authored; and (4) counsel stated he had nothing positive to say about Z.M.

The State argues counsel advocated for Z.M. in two ways at sentencing. First, counsel objected to the State's recommendation to sentence Z.M. on both the premeditated murder and felony murder convictions. See, e.g., *State v. Thach*, 305 Kan. 72, 86-87, 378 P.3d 522 (2016) (explaining "the jury may receive instructions on both theories although a defendant may not be sentenced to both premeditated murder and felony murder for a single killing"). But this objection came only after the court had rejected as multiplicitous the State's suggestion. Z.M.'s counsel merely agreed and did not raise the concern on his own.

The State asserts Chappas also opposed the State's recommendation to run Z.M.'s sentences consecutive, urging the court to consider Z.M.'s youth and order concurrent sentences. (Apparently persuaded, the court ordered concurrent sentences, which reduced the overall sentence by 94 months—or nearly 8 years—from what it could have been.) Thus, Chappas did do something to focus the court's attention on both a reason to justify leniency and a way in which that leniency could be granted. While his effort was brief, caselaw shows its importance to a *Cronic* analysis.

24

"Errors evaluated under *Cronic* are rare, and most alleged deficiencies are properly evaluated under *Strickland* rather than *Cronic.*" *State v. Adams,* 297 Kan. 665, 670-71, 304 P.3d 311 (2013); see also *Florida v. Nixon*, 543 U.S. 175, 190, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) ("We illustrated just how infrequently the 'surrounding circumstances [will] justify a presumption of ineffectiveness' in *Cronic* itself.").

For example, in *Bell v. Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002), Bell asserted a sentencing-based *Cronic* argument. He argued trial counsel was ineffective at sentencing in a capital case because counsel did not present mitigating evidence and waived final argument. In rejecting Bell's position, the Court reiterated that "when we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *Cone*, 535 U.S. at 696-97. The Court differentiated between failing to oppose the prosecution "as a whole," which would implicate *Cronic*, and failing to oppose the prosecution "at specific points," which would implicate *Strickland*. 535 U.S. at 697. The Court characterized this difference as "not of degree but of kind." 535 U.S. at 697. It ultimately held that *Strickland* should govern Bell's asserted errors. 535 U.S. at 698.

Similarly, we conclude Z.M.'s asserted errors within the context of sentencing are specific, rather than a complete abandonment. See *Miller v. Martin,* 481 F.3d 468, 473 (7th Cir. 2007) ("In the wake of *Bell*, courts have rarely applied *Cronic*, emphasizing that only non-representation, not poor representation, triggers a presumption of prejudice."). Z.M. was not *completely* denied counsel at a critical stage because Chappas argued for concurrent sentences. Z.M. has not shown a *Cronic* violation. To be clear, we take no position on whether there is either deficient performance or prejudice under the *Strickland* test.

III.     *The prosecutor did not misstate the law on aiding and abetting, premeditation, or first-degree murder.*

Z.M. next argues the prosecutor committed reversible error during voir dire and closing arguments by misstating the law of aiding and abetting, premeditation, and first-degree murder.

*Preservation and Standard of Review*

Though Z.M. did not object during trial to the statements he now asserts are error, this issue is properly preserved for review. "[W]e will review a prosecutor's comments made during voir dire, opening statement, or closing argument on the basis of prosecutorial error even without a timely objection, 'although the presence or absence of an objection may figure into our analysis of the alleged misconduct.'" *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017).

> "To determine whether prosecutorial error has occurred, we consider whether the challenged prosecutorial acts 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' If error is found, we then determine whether the error prejudiced the defendant's right to a fair trial by considering whether the State can prove that no reasonable possibility exists that the error contributed to the verdict. [Citations omitted.]" *Slusser*, 317 Kan. at 185.

It is error for a prosecutor to misstate the law. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021). When "determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *Hillard*, 313 Kan. at 843. A defendant is denied a fair trial "when 'the facts are such that the jury could have

26

been confused or misled by the statement.'" *State v. Davis*, 306 Kan. 400, 413, 394 P.3d 817 (2017) (quoting *State v. Hall*, 292 Kan. 841, 849, 257 P.3d 272 [2011]).

If error occurs, the second step when reviewing claims of prosecutorial error is to "determine whether the error prejudiced the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Since *Sherman*, we have applied "the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]." 305 Kan. at 109. "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109. The prejudice analysis is not amenable to a rigid test. 305 Kan. at 110-11.

*First Asserted Error—Aiding and Abetting*

Z.M. first argues the State misstated the law on aiding and abetting liability in voir dire and closing argument. In *State v. Bodine*, 313 Kan. 378, 396, 486 P.3d 551 (2021) (quoting *State v. Robinson*, 293 Kan. 1002, 1037-38, 270 P.3d 1183 [2012]), we explained aiding and abetting is not a distinct crime, but instead "'extends criminal liability to a person other than the principal actor.'" All persons who "aid and abet a crime are equally guilty without regard to the extent of each's participation." 313 Kan. at 397.

The current version of the aiding and abetting statute, K.S.A. 21-5210(a), became law in 2010. *Bodine*, 313 Kan. at 400. It provides:

> "A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires,

counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." K.S.A. 21-5210(a).

Based on this language, which applies to Z.M.'s 2019 crime, "the aider must intentionally assist the principal. In doing so, the aider must possess the mental culpability required for the commission of the crime for which the aider is assisting." *Bodine*, 313 Kan. at 401.

More specific to this case, in *State v. Overstreet*, 288 Kan. 1, 7-15, 200 P.3d 427 (2009), we explained that if a person is charged with aiding and abetting a premeditated murder, then the State must prove that the aider and abettor acted with the same specific intent as the principal. Put differently, "the State [is] required to prove that the defendant shared in the specific intent of premeditation and thus promoted or assisted in the commission of the specific crime of premeditated first-degree murder." 288 Kan. at 11; see also *State v. Gonzalez*, 311 Kan. 281, 291, 460 P.3d 348 (2020) ("To convict a defendant of a specific intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal.").

Z.M. argues the prosecutor's statements in voir dire and closing argument failed to explain the State's burden of showing Z.M. acted with premeditation. Because of this, the argument goes, the jury could have found Z.M. guilty of premeditated murder as an aider and abettor if the jury believed his intent was simply to scare the occupants of the other car or cause the other car to wreck. The State disagrees and urges the court to consider the overall context of the prosecutor's comments, and not just each statement in isolation.

We agree with the State's position. When read in context, the prosecutor's explanation of aiding and abetting appropriately alluded to the fact that everyone in the car, including Z.M., understood they were chasing the Grand Marquis with the specific

intent of committing a premeditated murder. The prosecutor discussed aiding and abetting four times during voir dire. The first and second discussions were as follows:

"[STATE]: Okay. There is one concept, a principal of criminal responsibility that I want to talk to you about . . . . A principal of criminal responsibility, aiding and abetting . . . And if someone is aiding and abetting someone else to commit a crime, is it your personal believe [*sic*] that they should be held responsible just as the person that committed the crime?

"PROSPECTIVE JUROR [B.]: Yes.

"[STATE]: . . . The classic case that we often talk about, one that people either see on TV or have heard about is the bank robbery case, right?—where you'll see three guys jump in the car. They drive to the bank. Someone is driving. Two guys jump out. One has the gun, holds the bank teller up while the other guy stuffs the bag full of money. They all go, run out of the bank, get in the car and drive away. Now, there's only one person that took the money, but that person doesn't take the money if the other person doesn't hold a gun to the teller's head. And neither one of them do that if they don't get there by the driver to get away with the gun. So there may be one person that committed the aggravated robbery, but there's two that aided and abetted him, under the principle of criminal responsibility, aiding and abetting, in for a penny, in for a pound. If you aided and abetted, you are as responsible as the person that stuffed that bag full of money. . . .

"Ms. [H.], if you are driving someone to the Kwik Shop, and you think they're going inside to get some pop, and they come out and jump in the car, and you drive away, and all-of-a-sudden, you have cops following you. It turns out the person you took to the Kwik Shop robbed the Kwik shop, but you had no knowledge, right? You were just driving. Would you—should you be held as responsible just because you are merely present?

"PROSPECTIVE JUROR [H.]: Not in that situation, no.

29

"[STATE]: So there are situations where on its face, it could look like you aided and abetted, right?

"Mr. [I.], is that right?

"PROSPECTIVE JUROR [I.]: Right.

"[STATE]: So we have to look at what was your level of involvement. Did you aid and abet? Did you encourage and assist and aid that person in any meaningful way, or were you just there?—literally just there, unknowingly. That's the difference."

And:

"[STATE]: Did you understand the conversation regarding aiding and abetting, specifically the example that I used about the bank robbery?

"PROSPECTIVE JUROR [T.]: Yeah.

"[STATE]: And do you agree that that is a principle of criminal liability that a person could be found guilty based on their participation in a criminal act.

"PROSPECTIVE JUROR [T.]: Yes."

In both discussions, the prosecutor illustrated aiding and abetting liability by giving the example of the driver in an armed robbery. The prosecutor explained that all participants in the armed robbery were "in for a penny, in for a pound," meaning that even a participant with a minor, offsite role in collectively effectuating an armed robbery nonetheless has full legal responsibility for committing that crime. The prosecutor also clarified an individual would not be aiding and abetting if the individual drove someone to a gas station thinking the passenger would buy a beverage, but the passenger instead robbed the store.

30

The third voir dire discussion again referenced the armed robbery hypothetical, and included an explanation that aiding and abetting liability required an aider and abettor to share the intent of the principal:

"Is everyone comfortable with the fact that under our principles of law in Kansas and aiding and abetting, that *if the getaway driver was in on it, he knew the plan? He wanted them to rob the bank*, that he is just as guilty of bank robbery as the two folks that went into the bank." (Emphasis added.)

The fourth voir dire discussion reiterated this point. It went as follows:

"[STATE]: Okay. There is one concept I didn't share with this entire panel, but I will talk to you about it . . . [a]nd that is the concept of aiding and abetting. Do you know what—have you heard of that before?

"PROSPECTIVE JUROR [D.]: I've heard it.

. . . .

"[STATE]: . . . Oh, aiding and abetting; right? You said you heard of that concept before. Do you have an example that comes to mind at all, what would be aiding and abetting?

"PROSPECTIVE JUROR [D.]: Not really.

"[STATE]: Yeah, I—well, you know. I do this all the time, so I have a few examples for you. . . . But the one I used this morning was the bank robbery. So if you have a person—three people get in [a] car and gonna go rob Cap Fed. I think that is the bank right over here—and they get in the car. One person drives. The other two jump out, go into the bank. One has the gun on the teller, and then the other one stuffs a bag full of money, but only one of them really robbed the bank; right?

31

"PROSPECTIVE JUROR [D.]:  Right.

"[STATE]:  Are the other two good for it too?

"PROSPECTIVE JUROR [D.]:  They guilty.

"[STATE]:  Yeah, because that's aiding abetting; right?

"PROSPECTIVE JUROR [D.]:  Right, yeah.

"[STATE]:  Because they assisted either before or during the commission of the crime; right? One was even—never even got out the car. Never even went in the bank, but he's the driver. He got them there. That's aiding and abetting.

"PROSPECTIVE JUROR [D.]:  Aiding and abetting.

"[STATE]:  Right. So is that something that you're okay with as a legal principle of criminal responsibility? That's a mouth full there, but basically they're held as responsible as the person that robbed the bank. Are you okay with that?

"PROSPECTIVE JUROR [D.]:  I don't know about the driver. He probably didn't know what they was doing.

"[STATE]:  Okay. Now, that's a good point. We even talked about that this morning. What if the driver thought, hey, I'm gonna take my two buddies to the bank. They want to go in there and do a deposit—

"PROSPECTIVE JUROR [D.]:  Right.

"[STATE]:  Right? And then they come out and say, 'hey, Joe, let's go,' and they drive off. Well, maybe he didn't know that those two robbed the bank. You're right. But what if he did know? What if he drove them there to do that?

32

"PROSPECTIVE JUROR [D.]:  Then that's helping about—

"[STATE]:  He's aiding and abetting.

"PROSPECTIVE JUROR [D.]:  Aiding and abetting, yes.

"[STATE]:  Okay. And there is absolutely a difference, but you have to pay attention to that to see if that applies."

There, a prospective juror suggested a driver in a bank robbery may not be guilty as an aider and abettor if the driver did not know they were driving to a bank robbery. The prosecutor agreed and explained the driver would be aiding and abetting *if* the driver was aware of the plan and drove the others to the bank to commit the robbery. In fact, the prosecutor explained "there is absolutely a difference" between the two scenarios.

The prosecutor returned to the bank robbery hypothetical in closing argument. The relevant portion reads as follows:

"We are not required to nor are we attempting to prove that [Z.M.] fired the 9-millimeter, . . . had the 9-millimeter. It doesn't matter. That is just part of what happened. What matters is [J.M.] was murdered on 37th Street on that day, that he shot from behind with a 7.62 from a car that was trailing them from an individual who had seated himself on the window ledge, propped up that 7.62 up over the roof and left off 20 shots—pow, pow, pow, pow, pow, pow, pow—killing him. That's what matters.

"So why [Z.M.]? [Prosecutor], you're saying that he may not even have shot that 9-[millimeter]. We know he didn't shoot the 7.62, because he was driving. So why is he here for murder? We talked about that on Monday, aiding and abetting. We talked about the example of the bank robber. Three guys jump in the car. They both rob Cap Fed. You've got your driver driving there. Two guys jump out. One goes in, holds the guard at gunpoint, while the third person stuffs the bag full of money. In for a penny in for a pound. They're all good for it. That's what the law says, and that makes sense to us. You

33

all are equally responsible, unless it's mere presence or a mere association. As an example, Mr. Wolfley was nearby. Mr. Stokes was nearby. Mr. Eisenberger and the AMR was nearby. They were merely present. The[y] weren't participants. They couldn't be charged with this crime. But what about [Z.M.]? He didn't shoot anyone. We don't know that, but let's assume that. Does this happen without him? Does he aid and abet them? Absolutely. In fact, he may be the most critical person in the commission of this crime. And I'm not just saying that, because but for him, this doesn't happen this way; right? If [D.W.] or [L.J.] are on foot with their guns and wanting to shoot at the Grand Marquis after it leaves the neighborhood, good luck. You need a way to get there. And that's where [Z.M.] came in. He was the driver. He knew exactly from the time they pulled out when they have guns—a long gun getting in there, and they yell, 'Let's get em.' And he peels out. And you heard Mr. Keeler say that the front seat passenger said, 'Go, go, go, go,' with a gun. And what does [Z.M] do? He goes. He is the driver, the classic example of an aider and abettor. He even tells it to his brother. 'Yo, Bro, they slid on us. I'm fixing to slide on them back.' And then you hear the shots. 'Where you at? Where you at?' 'I'm going to [D.W.]'s.' He even said [D.W.]'s. 'We just made 'em wreck.' There's a reason there. He's part of it. He knows that. This took all of their efforts to commit this crime, not just [L.J.] or [D.W.]. It took a driver, and [Z.M.] is that guy.

"Ladies and gentleman, the evidence is overwhelming that [Z.M.] is criminally responsible for the murder of [J.M.] Just like [L.J.] will have his day in court as will [D.W.]. They will have their day. But today is [Z.M.]'s day."

During closing argument, the prosecutor reminded the jury of the bank robbery discussion and suggested the principles outlined in it applied to Z.M.'s liability as an aider and abettor. For example, the prosecutor again used the phrase "in for a penny, in for a pound." And he explained Z.M. was "the driver, the classic example of an aider and abettor," thereby hearkening back to the example described in voir dire. And finally, the prosecutor outlined the requirements of premeditation immediately after the aiding and abetting discussion, allowing the jurors to connect aiding and abetting and the mens rea requirement of the charged crime.

There is no requirement that each discussion of aiding and abetting must include every aspect of the doctrine. It is not legal error to discuss the doctrine's various aspects separately so long as the jury is not confused or misled. Here, the prosecutor accurately described aiding and abetting. The prosecutor neither stated nor implied that *only* association was sufficient or that a specific intent to commit premeditated murder was not required. When understood collectively, we conclude these statements of aiding and abetting liability did not misstate the law and would not mislead or confuse jurors. We see no error here.

*Second Asserted Error—Premeditation*

Z.M. next alleges the prosecutor misstated the law on premeditation. In closing argument, the prosecutor explained:

"I want to talk to you a little bit about some of the instructions, because there's quite a few of them, and sometimes it can get a bit overwhelming when you look at the charges. As an example, the defendant is charged in Count 1 with first-degree premeditated murder. Those are the—then you see the elements in there, right, that the killing was done by the defendant, or another as the aiding and abetting element here. You know the evidence to support that, that it was done intentionally, meaning not by accident. It wasn't done recklessly. They set out to do exactly what they did, and they did it. They accomplished it.

"There was known premeditation. Well, what does that mean? Does it have to be drawn out in a contract? Does it have to be agreed to weeks earlier? Does it have to be planned out? No. It just has to be something more than instantaneous. In this particular case, we know it took time, because they had to leave the neighborhood, drive down to 37th, chase them down as someone is sitting up over the roof of the car firing off rounds. That's thought about beforehand. That's not just incidental. Oh, there they go. Bam. That's different. That's not what happened. This is premeditated murder, ladies and gentlemen."

35

We recently explained that "what distinguishes premeditation from intent is both a temporal element (time) and a cognitive element (consideration). It is 'thought' that happens 'beforehand.'" *State v. Stanley*, 312 Kan. 557, 573, 478 P.3d 324 (2020). More specifically:

> "Premeditation, then, adheres in the conditions present when intent was formed. If intent is the mental condition of purpose, aim, and objective, then premeditation exists when that mental condition arises before the act takes place and is accompanied by reflection, some form of cognitive review (i.e., 'thinking over'), deliberation, conscious pondering. That is, premeditation is a cognitive process which occurs at a moment temporally distinct from the subsequent act." *Stanley*, 312 Kan. at 572.

Z.M. cites *Stanley* for the proposition "that what distinguishe[s] premeditation from intent was *more* than mere timing." *Stanley*, 312 Kan. at 570. From this, we understand his argument to be the prosecutor misstated the law because the prosecutor did not also inform the jury that premeditation requires "a period, however brief, of thoughtful, conscious reflection and pondering" before the killing allowing the actor to change their mind. 312 Kan. at 574.

But the prosecutor's comments, again read in context, appropriately explain both the temporal and cognitive elements of premeditation. First, regarding the temporal element, the prosecutor suggested that Z.M., D.W., and L.J. had time to drive and chase down the vehicle driven by J.M., meaning the shooting was not "just incidental" or instantaneous. This is an accurate statement of the law. In fact, we have found error many times when a prosecutor suggested "that premeditation can be instantaneous with the homicidal act." *State v. Kettler*, 299 Kan. 448, 476, 325 P.3d 1075 (2014); *State v. Williams*, 299 Kan. 509, 544-45, 324 P.3d 1078 (2014) (collecting cases).

Next, the prosecutor referenced the cognitive element by stating the shooting was "thought about beforehand." And the prosecutor, when discussing the killing, observed "[t]hey set out to do exactly what they did, and they did it. They accomplished it." The "set out to do what they did" language suggests a design to kill J.M. These are proper statements of the law and demonstrate the prosecutor's comments referenced the "thoughtful conscious reflection and pondering" requirement of premeditation as outlined in *Stanley*. See also *State v. Brownlee*, 302 Kan. 491, 515, 354 P.3d 525 (2015) ("'Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act.'") (quoting *State v. Jones*, 298 Kan. 324, 336, 311 P.3d 1125 [2013]).

We conclude the prosecutor's statements led the jury to accurately understand premeditation occurs more than instantaneously and involves some type of "cognitive review" or "'thinking over'" before the killing. *Stanley*, 312 Kan. at 572. Again, we see no error.

*Third Asserted Error—First-degree Murder*

Z.M. also asserts the prosecutor misstated the law on first-degree murder. In closing argument, the prosecutor explained:

> "A second count of first-degree murder is also charged. We call it felony murder. So you think, well, how can anyone be charged with two murders for one murder, one homicide? There are two alternative charges. So you look at the first-degree premeditated. I'm already seeing I'm getting looks on your faces of confusion. I understand. The first one, you go through the elements. If you believe, based on the evidence that was presented, that the State has met its burden on each of those elements, you find him guilty of first-degree premeditated murder.

"Then you turn the page, and you get to felony murder. Those have their own elements again, and you go through those elements. And in that particular case, it requires the intentional death. Let me just look at that real quick—that the defendant, or another killed [J.M.], that the killing was done while the defendant, or another was committing the crime of criminal discharge of a firearm. Well, that evidence is not even in dispute, right? Either [D.W.] or [L.J.] was firing off rounds on the 7.62 into that occupied vehicle. And as a result of that, [J.M.] was killed. And again, under aiding and abetting, [Z.M.] is criminally responsible as the other two are. So as you go through those elements, you would find the defendant guilty of murder in the first-degree under felony murder as well. So two murders for one homicide. Well, what happens at that point is by operation of law. That doesn't involve you. It will involve the Judge. The Court will only be able to accept or sentence the defendant as to one of the two. You decide whether they were both there. If they were, you find him guilty. But I want to assure you, you don't get sentenced for two murders for one homicide."

Z.M. argues these comments erroneously characterized felony murder as a lesser included offense of premeditated murder. He is correct that felony murder and premeditated murder are alternative ways to commit first-degree murder, and thus it would be erroneous to describe felony murder as a lesser included offense. See *State v. Stewart*, 306 Kan. 237, 247, 393 P.3d 1031 (2017); K.S.A. 21-5402(d).

But the prosecutor did not describe felony murder and premeditated murder as separate crimes, nor did the prosecutor use the term "lesser included" during this discussion. We do not discern any comments that would mislead the jury about the hierarchy of the charged crimes. Again, the prosecutor did not err. We do not consider whether the alleged errors were harmless because we do not find any misstatements of the law.

IV.    *Z.M. did not receive the correct jury instructions, but this did not rise to the level of clear error.*

Z.M. argues the court failed to provide the appropriate jury instructions on aiding and abetting liability, first-degree murder, and its lesser included offense.

*Standard of Review and Preservation*

> "The multi-step process for reviewing instructional errors is well-known:  First, the court decides whether the issue was properly preserved below. Second, the court considers whether the instruction was legally and factually appropriate. Third, upon a finding of error, the court determines whether that error is reversible. Whether the instructional error was preserved will affect the reversibility inquiry in the third step of this analysis. [Citations omitted.]" *State v. Couch*, 317 Kan. 566, 589, 533 P.3d 630 (2023).

Because Z.M. did not object to the jury instructions at trial, the issue is not preserved and therefore our reversibility inquiry evaluates whether the instructions constitute clear error. *Couch*, 317 Kan. at 590. We do not conclude there was clear error unless we are "firmly convinced that the jury would have reached a different verdict had any instructional error not occurred." 317 Kan. at 590.

We have unlimited review over the legal appropriateness of a jury instruction. *State v. Wimbley*, 313 Kan. 1029, 1034, 493 P.3d 951 (2021). "To be legally appropriate, the instruction must fairly and accurately state the applicable law." 313 Kan. at 1034. A jury instruction is factually appropriate when "sufficient evidence, viewed in the light most favorable to the requesting party, supports the instruction." 313 Kan. at 1033. We review "jury instructions as a whole and do not isolate any one instruction." *State v. Craig,* 311 Kan. 456, 461, 462 P.3d 173 (2020). "If the jury instructions properly and

39

fairly stated the law and were not reasonably likely to mislead the jury, then no error exists for this court to correct." *State v. Coleman*, 318 Kan. 296, 313, 543 P.3d 61 (2024). See *State v. Hilyard*, 316 Kan. 326, 334, 515 P.3d 267 (2022). In other words, "it is immaterial if another instruction, upon retrospect, was also legally and factually appropriate, even if such instruction might have been *more* clear or *more* thorough than the one given." 316 Kan. at 334.

*The aiding and abetting instruction was appropriate.*

Z.M. argues the court should have provided a shared-intent instruction for aiding and abetting. He asserts the court should have instructed the jury that he could only be found guilty of premeditated murder under an aiding and abetting theory if the jury found that he shared the principal's specific intent of premeditation. He contends the phrase "mental culpability," which is found in his aiding and abetting instruction, insufficiently explains the shared intent requirement. Accordingly, he argues the aiding and abetting instruction provided was not legally appropriate. Both parties agree the instruction was factually appropriate.

As noted above, our current aiding and abetting statute provides: "A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." K.S.A. 21-5210(a).

Z.M.'s aiding and abetting instruction provided:

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally

40

aids another to commit the crime, or advises, counsels, procures, the other person to commit the crime.

"All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime."

Z.M. contends the phrase "mental culpability" in his jury instruction is unclear and would mislead the jurors about whether the State had to prove Z.M. had premeditation to kill J.M. He characterizes "mental culpability" as a term of art and suggests a non-attorney would not have understood its meaning. Because of this, he asserts a juror would not have understood the aiding and abetting instruction was referencing the premeditation requirement found in the premeditated first-degree murder instruction. And he correctly points out that the term "mental culpability" is not defined or explained in any of the other jury instructions.

It is an issue of first impression as to whether the phrase "mental culpability" in K.S.A. 21-5210(a) is unclear and should be defined or otherwise explained in jury instructions. In *State v. Robinson*, 261 Kan. 865, 877, 934 P.2d 38 (1997), we observed "[a] jury is expected to decipher many difficult phrases without receiving specific definitions, such as the term 'reasonable doubt.'" We later explained:

"In assessing whether definition of instructional terms is legally appropriate, we have held that 'a trial court "need not define every word or phrase in the instructions. It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined." We further stated that "[a] term which is widely used and which is readily comprehensible need not have a defining instruction." [Citations omitted.]'" *State v. Robinson*, 303 Kan. 11, 275-76, 363 P.3d 875 (2015).

41

Here, we conclude Z.M.'s aiding and abetting instruction was legally appropriate for several reasons. First, the aiding and abetting jury instruction echoed the aiding and abetting statute. See *Hillard*, 315 Kan. at 776 ("Generally, jury instructions patterned after statutes are legally proper.").

Second, the meaning of the phrase "mental culpability" is readily comprehensible. Merriam-Webster's dictionary defines "mental" as "of or relating to the mind." Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/mental. It also defines "culpability" as "responsibility for wrongdoing or failure:  the quality or state of being culpable." Merriam-Webster Online Dictionary, *available at* https://www.merriam-webster.com/dictionary/culpability. Taken together, the common dictionary understanding of "mental culpability" may be broadly defined as "responsibility for wrongdoing that occurs in the mind," and this common understanding tracks the use of the phrase in our aiding and abetting statute. See *State v. Bartlett*, 308 Kan. 78, 88, 418 P.3d 1253 (2018) (the district court did not err by failing to give a definition of "intentionally" because the term's legal definition was "essentially the same as the common meaning of the word"). We simply do not believe the phrase "mental culpability" is too inscrutable or too arcane for a person "of common intelligence and understanding" to comprehend. *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 (1979); see also *State v. Bolze-Sann*, 302 Kan. 198, 210-11, 352 P.3d 511 (2015) ("imminence" did not need to be defined in jury instruction because the term is "widely used and readily comprehensible"). Moreover, Z.M. does not direct us to any authority suggesting the phrase requires a definition.

Third, Z.M.'s instructions included three defined mental states. Instruction 10, the premeditated murder instruction, defined "premeditation" as follows:

"'Premeditation' means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time

42

period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Instruction 10 also included the following definition of "intentionally": "A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State, or cause the result complained about by the State."

Instruction 13, the instruction outlining the elements of felony murder, defined "recklessly" as follows:

"A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that certain circumstances exist or a result of the defendant's actions will follow. This act by the defendant disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation."

Since the jurors were instructed on several types of mental states, each with their own definitions, we believe that a juror, when reading the instructions as whole, would understand that the phrase "mental culpability" in the aiding and abetting instruction referred to those defined mental states. Because of this, the aiding and abetting instruction's phrase "with the mental culpability required to commit the crime" would direct jurors to consider whether Z.M. shared the mental state as outlined in the elements of premeditated murder. That is, jurors would understand that to convict Z.M. of aiding and abetting a premeditated murder, the jury must find Z.M. shared the principal's specific intent of premeditation, which was defined in the premeditated murder jury instruction.

The aiding and abetting instruction's phrase "with the mental culpability required to commit the crime" contained what Z.M. characterizes as the concept of shared intent. The jury instructions were legally appropriate.

43

*First-degree murder and second-degree murder instructions were not clearly erroneous.*

Z.M. next argues the court failed to provide the appropriate jury instructions regarding first-degree murder and its lesser included offense. The jury was provided 16 instructions. Instruction 9 is described above and outlined aiding and abetting liability. Instruction 10 was the premeditated murder instruction. Instruction 11 explained that second-degree murder is a lesser included offense of premeditated murder in the first-degree. Instruction 12 outlined the elements of second-degree murder. Instruction 13 was the felony murder instruction. Instruction 14 provided the elements for criminal discharge of a firearm at an occupied vehicle. Instruction 15 provided:

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding juror."

Among other things, Instruction 16 explained the jurors' agreement upon a verdict must be unanimous.

On appeal, Z.M. argues that he should have received instructions and verdict forms modeled after the following pattern jury instructions: PIK Crim. 4th 54.130, 68.190, and 68.200. Z.M.'s Instruction 10, which was modeled on PIK Crim. 4th 54.110, outlined the **premeditated** murder elements as well as the definitions of premeditation and "intentionally." Instruction 13, modeled on PIK Crim. 4th 54.120, set out the elements of felony murder and defined "recklessly."

44

Z.M. argues that, along with Instructions 10 and 13, the court should have provided the jury with an instruction based on PIK Crim. 4th 54.130, which informs the jury that when a defendant is charged with one first-degree murder offense, and the State has presented evidence on theories of both premeditated murder and felony murder, the jury "must consider both theories in arriving at" the verdict. PIK Crim. 4th 54.130.

The Notes on Use for PIK Crim. 4th 54.130 provide: "Where the information and evidence include both felony murder and premeditated murder, this instruction must be given in addition to PIK 4th 54.110, Murder in the First-degree, and PIK 4th 54.120, Murder in the First-degree—Felony Murder." The court suggested the inclusion of this instruction at the jury instruction conference, but the State did not want to do so.

Z.M. also asserts several other errors, all which flow from the court's failure to provide the "alternative theories" instruction. He first challenges his multiple count verdict instruction. Z.M.'s Instruction 15 followed the multiple counts verdict instruction from PIK Crim. 4th 68.060, which provided:

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

Z.M.'s jury received three verdict forms. Z.M.'s premeditated first-degree murder verdict form provided the jury three options: Z.M. was guilty of first-degree premeditated murder, Z.M. was guilty of the lesser included offense of second-degree murder, or Z.M. was not guilty. His felony murder and criminal discharge of a firearm at an occupied vehicle resulting in great bodily harm verdict forms each provided two options: guilty or not guilty.

45

Z.M. asserts that instead the jury should have been instructed using the verdict instruction and verdict form found in PIK Crim. 4th 68.190 (Murder in the First-degree, Premeditated Murder, and Felony Murder in the Alternative Verdict Instruction) and 68.200 (Murder in the First-degree, Premeditated Murder, and Felony Murder in the Alternative Verdict Form), respectively.

The verdict instruction in PIK Crim. 4th 68.190 walks a jury through its deliberations when there are alternative theories for one first-degree murder. The instruction explains the jury "may find the defendant guilty of murder in the first-degree; or murder in the second degree; or voluntary manslaughter; or involuntary manslaughter; or not guilty." Further, the instruction directs the jury to *first* consider whether the defendant is guilty of first-degree murder. Next, if the jury does not find the defendant guilty of first-degree murder, then the jury should consider the lesser included offense of second-degree murder. The instructions continue this pattern as the jury works through the various homicide crimes in descending order of severity. See *State v. Bernhardt*, 304 Kan. 460, 473, 372 P.3d 1161 (2016) ("We have recognized five degrees of homicide, in descending order: capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter.").

And PIK Crim. 4th 68.200, Z.M.'s preferred verdict form, provides three options for the first-degree murder determination in a single jury form. It requires the jurors to first note whether the jury unanimously found the defendant guilty of first-degree murder. If so, the verdict form then asks the jury to identify whether (1) the jury was unanimous as to the defendant's guilt on the theory of premeditated murder; (2) the jury was unanimous as to the defendant's guilt on the theory of felony murder; or (3) the jury was unanimous as to the defendant's guilt "on the combined theories of premeditated murder and felony murder." PIK Crim. 4th 68.200. The verdict form then includes

46

options to find the defendant guilty of other homicide crimes in descending order, as well as an option to find the defendant not guilty.

The Notes on Use of PIK Crim. 4th 68.190 explain it should be given when, as here, the defendant is charged with alternative theories of first-degree murder. And the Notes on Use of PIK Crim. 4th 68.200 explain it should be given along with PIK Crim. 4th 68.190. The Notes on Use of PIK Crim. 4th 68.190 explain that it should not be used simultaneously with PIK Crim. 4th 68.060, which was the template for Z.M.'s multiple counts verdict instruction.

Finally, Z.M. asserts the court erred in its instruction on the lesser included offense of second-degree murder. Z.M.'s instruction, Instruction 11, was modeled on PIK Crim. 4th 68.080. It provided:

"The offense of premeditated murder in the first-degree as charged in Count 1 with which the defendant is charged includes the lesser offense of murder in the second degree.

"You may find the defendant guilty of murder in the first-degree, murder in the second degree, or not guilty.

"When there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only, provided the lesser offense has been proven beyond a reasonable doubt.

"Your Presiding Juror should mark the appropriate verdict."

But PIK Crim. 4th 68.080's Notes on Use explain:  "This instruction should not be used when the crime is first-degree murder under the alternative theories of premeditated murder and felony murder. Instead, use PIK 4[th] 68.190 and 68.200[]."

47

Accordingly, Z.M.'s overall contention is the court committed clear error by failing to provide the alternative theories instruction, and this failure cascaded into other associated failures in his jury instructions and verdict forms.

Z.M. directs us to *State v. Dominguez*, 299 Kan. 567, 328 P.3d 1094 (2014). The State charged Dominguez with premeditated first-degree murder or, in the alternative, felony murder; attempted first-degree murder; and discharge of a firearm at an occupied building. The jury convicted Dominguez of premeditated first-degree murder, aggravated battery (a lesser included offense of attempted first-degree murder), and discharge of a firearm at an occupied building.

On appeal, Dominguez argued the trial court failed to give an instruction and verdict form "designed for trials in which the State presents alternative theories of first-degree murder to the jury." *Dominguez*, 299 Kan. at 575. We explained we needed to determine "whether the trial court's instructions adequately covered the essential information contained in those alternative theory pattern instructions—that is, whether the instructions that were given were legally appropriate." 299 Kan. at 576.

Our task is identical here. We conclude Z.M.'s actual instructions were not legally appropriate because the instructions given provided an incomplete and inaccurate picture of the law. See *Dominguez*, 299 Kan. at 576 (quoting *State v. Tully*, 293 Kan. 176, 197, 262 P.3d 314 [2011]) ("This court has explained the wisdom of using the PIK instructions, stating: 'When a district court ventures from the standard language of a pattern instruction, the court runs the risk of . . . omitting words that are essential to a clear statement of law.'").

First, by failing to provide PIK Crim. 4th 54.130 along with the elements instructions of premeditated and felony murder, the jury was not informed that premeditated murder and felony murder were *alternative theories* for the single crime of first-degree murder. See *Dominguez*, 299 Kan. at 578 ("The jury instructions that were given to the jury did not explain that first-degree murder has two alternative theories or that felony murder must be considered in reaching a verdict on the charge of first-degree murder."); *State v. Sullivan*, 224 Kan. 110, 112, 578 P.2d 1108 (1978) ("When an information charges the defendant with premeditated murder and felony murder for the commission of a single homicide the state may introduce evidence on both theories at the trial, but the trial court should instruct the jury on both theories in the alternative in order to avoid double convictions or sentences."), *disapproved of on other grounds by State v. Berry*, 292 Kan. 493, 254 P.3d 1276 (2011).

And since PIK Crim. 4th 68.190 should have been given to direct the jury on how to properly sequence its consideration of the various homicide charges, Instruction 11 was legally inappropriate because Instruction 11 omits jury consideration of first-degree felony murder after rejecting first-degree premeditated murder but before considering the lesser crime of second-degree murder. Mitigating the situation found in the *Dominguez* instructions, however, Z.M.'s Instruction 13 does identify felony murder as first-degree murder, lessening the risk that Z.M.'s jury wrongly inferred felony murder was a crime lesser than first-degree premeditated murder.

Second, and relatedly, by failing to provide the verdict instruction in PIK Crim. 4th 68.190 and the verdict form in PIK Crim. 4th 68.200, the jury was not instructed that Z.M. could be convicted of first-degree murder if some jurors believed he was guilty of premeditated murder and the other jurors believed he was guilty of felony murder. See PIK Crim. 4th 68.200 ("Theory 1[c] We, the jury, unable to agree under Theory 1[a] or 1[b], do unanimously find the defendant guilty of murder in the first-degree on the

49

combined theories of premeditated murder and felony murder."). This "combined theory" possibility was excluded from Z.M.'s jury instructions and verdict forms, and Instruction 15 compounded this problem by telling jurors that "[e]ach crime charged against the defendant is a separate and distinct offense." See *Dominguez*, 299 Kan. at 584 (explaining language identical to Instruction 15 was "a misstatement of the law"). This language, combined with Instruction 16's directive that a verdict must be unanimous, suggested the jury had to be unanimous on each first-degree murder theory.

Because we find the district court failed to properly instruct the jury, our next inquiry is whether this failure rises to the level of clear error. In *Dominguez*, we noted his instructions did not make it clear the jury needed to consider *both* premeditated murder and felony murder before making a first-degree murder conclusion. Nor was felony murder described as a theory of first-degree murder. *Dominguez*, 299 Kan. at 580. The jury convicted Dominguez of premeditated murder but did not convict Dominguez of felony murder. This was concerning because "there was substantial evidence of the underlying felony, criminal discharge of a firearm at an occupied building." 299 Kan. at 584. We concluded the jury instructions, when considered along with the evidence and the verdict forms, suggested felony murder was a lesser included offense of premeditated murder, thereby directing the jury to only consider premeditated murder when evaluating first-degree murder. See 299 Kan. at 568 ("Consequently, we have no confidence the jury appropriately considered the alternative of felony murder, and we are firmly convinced the jury would have reached a different verdict if the instructional errors had not occurred.").

Here we do not have a concern like the one we had in *Dominguez*. The completed verdict forms reveal the jury unanimously found Z.M. guilty of first-degree murder under *both* theories: premeditated murder and felony murder. Even if Z.M. had received the jury instructions he requests on appeal, we are not firmly convinced the jury would have

50

reached a different verdict. The failure to provide these instructions does not warrant reversal.

*Cumulative error did not deny Z.M. a fair trial.*

Z.M.'s final argument is that cumulative error denied him a fair trial. "The test for cumulative error is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances." *Couch*, 317 Kan. at 597 (quoting *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 [2020]). As we explained in *State v. Waldschmidt*, 318 Kan. 633, Syl. ¶ 9, 546 P.3d 716 (2024), unpreserved instructional issues that are not clearly erroneous cannot be considered as a component of cumulative error. As we have found no other errors, we reject Z.M.'s argument that his convictions must be reversed for cumulative error.

CONCLUSION

We conclude:

(1) The district court did not abuse its discretion in denying Z.M.'s request for new counsel;

(2) trial counsel's performance at sentencing did not rise to the level of a *Cronic* violation;

(3) the prosecutor accurately stated the law;

(4a) the aiding and abetting jury instruction was not erroneous;

(4b) the jury instructions related to Z.M.'s murder convictions were not clear error; and

(5) cumulative error does not apply.

Affirmed.

\* \* \*

ROSEN, J., concurring in part and dissenting in part: I concur in most of the majority's opinion. I write separately because I believe defense counsel abandoned Z.M. at a critical stage in his trial and would thus vacate Z.M.'s sentence and remand for resentencing.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant effective assistance of counsel throughout trial and sentencing. *United States v. Cronic*, 466 U.S. 648, 656, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); see *Bell v. Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (evaluating whether counsel was ineffective during sentencing). To show counsel was ineffective in violation of the Sixth Amendment, a defendant usually must prove counsel was deficient and that the deficiency prejudiced their defense. *Bell*, 535 U.S. at 695. But in *Cronic*, the Supreme Court held a court should presume prejudice (1) when there is a "'complete denial of counsel' . . . at 'a critical stage'"; (2) when "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing'"; and (3) when "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Bell*, 535 U.S. at 695-96 (quoting *Cronic*, 466 U.S. at 659-62). In these situations, the Court has explained, "counsel has entirely failed to function as the client's advocate," *Florida v. Nixon*, 543 U.S. 175, 177, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), and the performance is "so likely to prejudice the accused that the cost of litigating their effect . . . is unjustified." *Cronic*, 466 U.S. at 658.

Z.M. has argued that his counsel ceased to function as his advocate during sentencing and we should thus apply the *Cronic* presumption of prejudice, reverse his sentence, and remand for resentencing. I agree.

Z.M. was convicted of first-degree murder on a theory of aiding and abetting after he drove a car from which his juvenile passenger shot and killed a teenager riding in another vehicle. As a result, 17-year-old Z.M. was facing a mandatory sentence of life in prison with no possibility of parole for 50 years. K.S.A. 21-6620(c)(1)(A); K.S.A. 21-6623. There was only one course of action that allowed Z.M. a chance at life outside of prison before he was nearly 70 years old: filing a motion for a downward departure to the hard 25. See K.S.A. 21-6620(c)(2); *State v. Hopkins*, 317 Kan. 652, 660, 537 P.3d 845 (2023) ("defendant preserves denial of a departure sentence for our review by moving for a departure at the district court and offering evidence in support, giving the district court a fair opportunity to rule on the merits"). But defense counsel offered no motion for departure and proceeded directly to sentencing, where he spoke as an adversary to his client's interests. In doing so, defense counsel forfeited any chance for a lesser sentence, effectively abandoning his teenage client at a critical stage of his trial. See *Hamilton v. State of Alabama*, 368 U.S. 52, 54, 82 S. Ct. 157, 7 L. Ed. 2d 114 (1961) (arraignment is a critical stage of trial because "what happens there may affect the whole trial" and, "available defenses may be as irretrievably lost, if not then and there asserted"); *State v. Hopkins*, 317 Kan. 652, 660, 537 P.3d 845 (2023) ("defendant preserves denial of a departure sentence for our review by moving for a departure at the district court and offering evidence in support"). I believe, under these circumstances, the *Cronic* error was complete upon this failure. See *Hamilton*, 368 U.S. at 55 (presuming prejudice when counsel denied at arraignment because this was only time defendant could have asserted certain defenses).

The majority rejects Z.M.'s challenge. It points out that defense counsel requested the court impose Z.M.'s 94-month sentence concurrent to the hard 50, so any failure in his representation cannot be a *Cronic*-style error. The majority cites the United States Supreme Court decision *Bell v. Cone* in support. In *Bell*, the defendant argued the Court should presume prejudice when counsel failed to produce mitigating evidence and

waived a closing argument during sentencing. The Court disagreed. It held that counsel had not "failed to oppose the prosecution throughout the sentencing proceeding as a whole," but "at specific points." *Bell*, 535 U.S. at 697. The majority concludes that, like in *Bell*, the challenge here is to specific errors, so it cannot presume prejudice.

I do not consider this case to be like *Bell*. During sentencing in *Bell*, counsel drew the jury's attention to mitigating evidence and urged the jury to have mercy on his client. Defense counsel then cross-examined the prosecution's witnesses and successfully opposed the admission of prejudicial evidence. After the prosecution offered a "low-key" closing argument, defense counsel waived final argument, which prevented the prosecution's "extremely effective advocate from arguing in rebuttal." *Bell*, 535 U.S. at 692.

The circumstances in this case were very different. Counsel in *Bell* made some strategic choices that the defendant alleged were ineffective. In contrast, defense counsel here completely abandoned Z.M. at a singularly critical stage of his trial. This case might be similar to *Bell* if counsel had filed a downward departure motion and offered no or little support in that motion. But counsel offered *nothing*. And I believe his colloquy at the sentencing hearing indicates that the decision to forgo that motion had nothing to do with strategy and was instead a product of defense counsel's apparent contempt for his own client. Before Z.M. was to be sentenced to life in prison, defense counsel told the court he "was "at a loss to in good faith present to the Court something positive that I can say about my client." He described Z.M. as being without "remorse, . . . repentance, . . . [and,] acceptance of his criminal action" or "acknowledgement of the life that in fact was taken" before reminding the court that Z.M. had written incriminating song lyrics about taking the victim's life. This astonishing statement, so blatantly adversarial to Z.M.'s interests, demonstrates just how completely Z.M. was denied effective assistance of

counsel. His constitutionally guaranteed advocate did not simply abandon him; he turned on him.

*Cronic* advises that a court should presume prejudice when there is a "'complete denial of counsel' . . . 'at a critical stage.'" *Bell*, 535 U.S. at 695-96 (quoting *Cronic*, 466 U.S. at 659, 662). I believe that happened here when counsel ensured his client would not be outside of prison walls until he was nearing the age of 70. I would remand for resentencing.