IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,143

STATE OF KANSAS,
*Appellee*,

v.

TYLER EUGENE KELLY,
*Appellant*.

SYLLABUS BY THE COURT

1.

A party does not need to challenge the evidence's sufficiency at trial to preserve the challenge for appellate review. Appellate courts review sufficiency challenges by viewing all the evidence in the light most favorable to the State to determine whether a rational juror could have found the defendant guilty beyond a reasonable doubt.

2.

When faced with a claim of instructional error, an appellate court first considers the reviewability of the issue from jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, the appellate court uses an unlimited review to determine whether the instruction was legally appropriate; then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and finally, if the district court erred, the appellate court must determine whether the State can establish that the error was harmless.

1

3.

     This court engages in a two-step review of claimed prosecutorial error. First, we consider whether there was error, i.e., whether the prosecutor exceeded their wide latitude in conducting the State's case. We do not consider statements in isolation but look to the context to determine whether error occurred. If there is error, the State must show that there is no reasonable possibility that the error contributed to the verdict.

4.

     When considering a *Jackson v. Denno* motion, an appellate court reviews the district court's factual findings for substantial competent evidence; the district court's legal conclusions are reviewed de novo.

5.

     A statement is involuntary if there is police overreach that overcomes an individual's ability to freely decide whether to make statements; such overreach may involve inherently coercive techniques or techniques that are coercive considering the unique circumstances of the suspect.

6.

     On appeal, voluntariness of a defendant's statement to law enforcement is assessed under a totality of the circumstances analysis.

     Appeal from Sedgwick District Court; TYLER ROUSH, judge. Oral argument held December 16, 2025. Opinion filed May 1, 2026. Affirmed.

     *Corrine E. Gunning*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

     *Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALSH, J.:  A jury convicted Tyler Eugene Kelly of the felony murder of J.F. committed during an aggravated burglary, resulting in a hard 25 sentence for murder, plus a consecutive 43 months for aggravated burglary and 13 months for aggravated assault. In this direct appeal, Kelly challenges the sufficiency of the evidence to support his convictions. He also alleges that multiple trial errors—including instructional, prosecutorial, and evidentiary errors—individually and cumulatively deprived him of a fair trial. On review, we assume one instructional error but conclude that it was harmless and therefore affirm the convictions and sentence.

## FACTS AND PROCEDURAL BACKGROUND

On July 27, 2021, the State charged Tyler Kelly with one count each of felony murder, aggravated burglary, and aggravated assault for the shooting death of 16-year-old J.F. ("Jay").

Kelly, then 20 years old, had befriended 16-year-old B.T. ("Ben"). They met through mutual friends, added each other as friends on Facebook, and communicated over Facebook Messenger. Kelly occasionally gave Ben rides, and on July 16, 2021, Kelly drove Ben and his girlfriend J.D. ("Juliet") to the hospital to visit their newborn baby.

Juliet was romantically involved with Ben and also with Jay. Jay had been incarcerated and had recently been released with an ankle monitor. Juliet had become pregnant with Ben's child while Jay was in custody. This rivalry, with Ben and Jay vying for Juliet, forms the backdrop for the circumstances that ultimately led to Jay's death.

3

On July 16, 2021, Jay sent Ben a message stating: "You should be tryna take kare of yo baby. but we both know you ain't gone do that." Jay followed up with: "That's why I'm here."

The morning of July 17, Jay's stepfather, Shaquille Cook, heard a loud noise and, from the house, saw that Ben had thrown a brick through the window of the car that Cook shared with Jay's mother. Ben flipped Cook off and drove away. Cook told Jay about the incident around 30 minutes later.

Jay and Ben continued to trade barbs by text that day and apparently agreed to fight each other: Ben said "OTW" around 3:09 p.m., and that he would be there in 30 minutes. Jay responded, "Koo," and then, around 3:58 p.m., Jay said, "Just kome box." Ben then sent two messages he later unsent, and the two sent each other thumbs up emojis around a minute later.

Meanwhile on July 17, Kelly was doing some work on a house. Ben began calling and messaging Kelly that evening at 7:42 p.m. After several missed calls, they connected by videochat, and Kelly ultimately responded to Ben by text: "Nsh imma help you," and discussed how he did not want to take anyone other than Ben to Jay's house. He stated: "Just fight if extra mf come I got you g."

Kelly eventually picked up Ben that evening and drove to Jay's residence, where Ben had broken the car window earlier that morning. At this point, three narratives emerged at trial. Cook testified at trial because he was in the house at the time. Ben also testified as part of a plea agreement. And Kelly testified in his defense. We discuss each narrative in turn.

4

*Shaquille Cook's testimony*

Cook testified that he and Jay were home alone that evening. Cook was not expecting anyone to come over that evening, and Jay had not told him he had invited anyone either.

Cook was napping in the master bedroom around 9 p.m. with the light off. He awoke when he heard the front door screen slam. The master bedroom door was open, and he testified to seeing two Black men run past his door into Jay's room. He recognized one of the men as Ben, who had broken his car window and flipped him off earlier that day. He heard Jay say "what the fuck are you doing here, blood" and then gunshots.

At that point, "probably about three, four seconds" after the gunshots, a white male appeared in his doorway that he identified as Kelly. Kelly was pointing a handgun at Cook that had an attached and illuminated flashlight and a drum magazine. Cook told Kelly, "You got it, man. You got it. I'm going to lay down." Kelly said nothing, but he fired one shot into Cook's room, which was later found outside the home stuck in a tree.

The white male (Kelly) then turned and went toward Jay's room; Cook got up and closed and locked the bedroom door. He heard someone saying "[o]ut, out, out," footsteps running outside, and then a car driving away. He called Jay's mother, his brother, and 911. He looked for Jay but he was not in his room; Cook saw blood and it looked like Jay had crawled out the window.

Cook's testimony contained some equivocation. For example, at one point Cook stated that Kelly and the two Black men were in his house, "All at the same time." He testified on direct examination that he heard two shots before Kelly arrived in *his doorway*, but, on cross-examination, he said he heard three shots and then Kelly came

5

through *the front door*. That is, he testified that prior to hearing those three shots Kelly was not in the house. On redirect, Cook testified that he heard the front door open and close twice *before* he saw Kelly in his doorway, and once again as everyone left. He then capitulated on his claim that Kelly was not inside during the first three shots by saying, in response to counsel asking him if he was "absolutely certain those first three shots were fired and Tyler Kelly was not in the house": "Tyler—I don't know Tyler Kelly is in the house, but I did hear two screen doors close." And he concluded his testimony by saying it was correct that Kelly "came in after the three shots were fired and after two Black males had already entered."

Cook also contradicted himself when discussing his knowledge of Jay's gun. On direct examination, he said he had no idea that Jay had a gun but admitted this was incorrect on cross-examination because he had seen the gun before. He also told an officer interviewing him the night of the shooting that Jay carried a gun when leaving home.

*Ben's testimony*

Ben testified for the State as part of a plea agreement in his own criminal case over the same events. At the beginning of his testimony, the State pointed this out and noted that a condition of the plea agreement was that he testified truthfully. In addition, Ben had been interviewed by detectives shortly after the event. He initially provided false statements to police suggesting he only went over to Jay's to end their beef and that Jay had invited them in. But when detectives told him Jay was dead and that this was a murder investigation, Ben said he would tell them the truth, and his interview statements were consistent with the testimony he provided at trial. Ben's recorded interview was played for the jury at trial.

6

Ben's version of events began with his argument with Jay over Juliet. He testified that they had been arguing over Facebook messenger for a couple of months. This involved sending threats back and forth. This boiled over and Ben busted the vehicle window on July 17. Then Ben explained his messages with Jay regarding a potential fight being planned. Although Ben told Jay he would be over there soon to have a fistfight, he did not go over at that time because he could not find a ride. His last conversations with Jay were around 4 p.m.

Ben communicated to Kelly that he wanted to go over and fight Jay. Ben wanted Kelly to go as well, "To make sure nobody else intervene[d] with [what] me and [Jay] had going on." His plan was, "Just to fight him. And— really, it was just to tell him stop messing with my baby momma, but it was to fight him." Ben said that he was hoping to scare Jay. Ben and Kelly discussed how the fight was meant to just be between Ben and Jay and no one else should be there. Ben thought Kelly could help because Kelly had a gun. At some point, Ben told Kelly what he was planning and why he needed Kelly. One of the text messages between Kelly and Ben involved Kelly telling Ben to "[k]eep low key wit me," and Ben explained that meant something like sneaky conduct.

Kelly eventually picked Ben up and they parked in front of Jay's house. Ben explained that they both got out of the vehicle and walked into Jay's house. Kelly was "right behind" him as they went in. The front door was open but the screen door was closed. Ben did not say anything as he entered because he wanted to surprise Jay. The house was dark but the light in Jay's room was on. Ben acknowledged he did not have permission to enter the home. He also never told Kelly that Jay was expecting them. As he entered and was moving toward Jay's room, he looked back and saw Kelly in the living room. Kelly joined him in case anyone else was there.

Jay was sitting on his bed with a plate of food when Ben reached the doorway. Jay then got up and grabbed a gun he had near him. As he was lifting it to fire, Ben grabbed him and they began wrestling for the gun. As this was going on, the gun went off and Ben was shot in the arm. Ben testified that Kelly was probably in the living room at this time since they came into the house together. Ben started calling Kelly's name to help, and Kelly came to the doorway and started shooting. At some point during the wrestling Jay's gun slid away.

After the shooting ended, Kelly told Ben to grab Jay's gun and they ran out of the house and to his car. They drove to Juliet's house, and Ben hid the guns under a board outside her home. Kelly drove off and, since no one was at Juliet's home, Ben knocked on a door across the street asking for help. The resident gave Ben a ride to the hospital.

After he was treated for a gunshot wound to his forearm, Ben was interviewed by detectives beginning at around 1 a.m. on July 18. As noted, Ben initially told detectives he was going over to apologize and end the beef with Jay and that he was invited in. But after detectives told him Jay was dead, Ben told detectives he would tell them "whatever y'all want to know, I'm snitching on gang." He then described Kelly as being in the living room as the wrestling occurred. Further, he explained the purpose of going over there: "[Kelly] was just supposed to help me check the dude" and that Ben "was just gonna tell [Jay] 'quit fuckin with my baby momma.'" He explained Kelly was going to help him check Jay, that is, scare him and put him in his place, and Kelly was going to use the gun to do so. During the interview, Ben told detectives where he stashed the two handguns.

On cross-examination, Ben agreed that Kelly saved his life. Ben explained he had planned a fight with Jay and that he had not cancelled the fight.

8

*Kelly's testimony*

Kelly testified in his defense and relayed a different version of events. In his account, Ben began texting and calling him on July 17. Kelly was initially annoyed and ignored the calls. He finally picked up and Ben told him someone broke his dad's car window. Kelly was unaware that Ben had broken a window that morning.

At some point, Ben asked for a ride because he was beefing with someone. Kelly explained the "low key" text messages meant that Ben should calm down because Kelly was getting irritated by all the missed calls. He told Ben that no one else should join them, even though Ben mentioned bringing others on one of their calls.

Kelly believed that Ben and Jay would fight and denied that he and Ben planned to go inside the home. He testified that Ben did not direct him to bring a gun, but he had the gun, a .40 caliber semi-automatic handgun, in his car for around four months. It had a drum magazine and an attached flashlight.

After picking Ben up, Kelly stopped to get a Black and Mild cigar. They drove to Jay's residence, where Kelly thought Jay would be waiting outside to fight. He did not expect Ben to enter the house. When they arrived, the front door was open, but Jay was nowhere to be found.

They both exited Kelly's vehicle, and Ben went into the house while Kelly stayed by his car and looked for his lighter, planning to smoke his cigar. Kelly testified he heard two or three gunshots and screaming almost immediately. Kelly then grabbed his gun and ran inside. He feared Ben's life was in danger.

Kelly headed toward the light of Jay's room and then noticed movement on his left. He turned the gun's flashlight on and saw a Black male, who was Cook. He told Cook to "get down since a bunch of people shooting guns in this house." He then saw into Jay's room and saw Jay and Ben wrestling. Kelly then got shot. Kelly was concerned for his life so he returned fire into Jay's room. He did not recall firing a bullet into Cook's room, though he suggested it may have been on accident. Kelly testified that he was shot three times in the chest and was worried he was dying. Kelly denied telling Ben to pick up Jay's gun, but then they both left the house and drove off. He dropped Ben off but testified he did not know Ben had taken the guns. He then drove himself to the hospital and was admitted to the emergency room.

On cross-examination, Kelly reluctantly admitted to being Ben's "backup" and explained that his role was "50-50" in the event. He acknowledged no one invited him into the home.

*Additional evidence*

At this point, the facts become clearer and are supported by multiple witnesses. While hospitalized, Kelly talked to three law enforcement officers. He testified at trial that he did not remember any of these conversations. Prior to trial, the State filed a *Jackson v. Denno* motion and, after a hearing on the motion, the district court found Kelly's statements to law enforcement were voluntary and admissible. More information regarding these interviews and the district court's ruling will be provided in our discussion on voluntariness below.

While Ben and Kelly were driving away, Jay crawled out of his bedroom window and walked until he found a neighbor who called 911. EMS arrived and transported Jay to a hospital. He died shortly thereafter.

10

At trial, the parties stipulated to the following:

"An autopsy performed on [Jay] showed that he suffered gunshot injury exit wounds to his right arm and right chest. The cause of death was a perforating gunshot wound that penetrated his right chest, struck his heart and lungs, and exited his left back. No projectiles were recovered from the body."

The State introduced ballistic evidence, including Kelly's gun, the .40 caliber semiautomatic, and Jay's gun, a 9-millimeter semiautomatic. Crime scene investigators recovered two .40 caliber casings that matched Kelly's gun in the vicinity of the bedroom doors, along with a fired .40 caliber projectile on the floor of Jay's bedroom. The second fired .40 caliber bullet was found in the tree outside Cook's wall. Investigators were also able to recover two fired 9-millimeter bullets and an ejected and unfired 9-millimeter round at the crime scene. The 9-millimeter was discovered with five remaining bullets in the magazine, and had a total capacity of eight, leading the State to argue in closing that Jay only fired two bullets. The State suggested that Kelly was not shot three times, but rather was shot twice, with one shot being an in and out, and the other shot grazing him across the chest, causing two additional wounds. And since Jay only fired twice, this placed Kelly inside the home during the wrestling match where the gunshots went off, thereby undermining Kelly's claim that he first heard shots and then ran inside. This was contrary to Kelly's earlier testimony that he was shot three times in the chest, had his spleen removed, and still had at least one bullet in him. Unfortunately, neither party presented any medical evidence regarding his injuries, but a picture showing what looks like three wounds on Kelly's chest was entered into evidence.

During the jury instruction conference, Kelly requested a self-defense instruction, but the court denied the request.

The jury convicted Kelly on all counts, and the district court sentenced him to a hard 25 for felony murder, and 43 months and 13 months for the aggravated burglary and aggravated assault convictions.

This is Kelly's direct appeal. Jurisdiction is proper. K.S.A. 22-3601(b)(3) (Supreme Court has jurisdiction over life imprisonment cases); K.S.A. 22-3601(b)(4) (Supreme Court has jurisdiction over off-grid crimes); K.S.A. 21-5402(b) (felony murder is an off-grid crime).

ANALYSIS

1. *The State presented sufficient evidence that (1) Kelly entered the house without authority and (2) Kelly intended to commit an aggravated assault when he entered or remained within the house.*

Kelly first argues there is insufficient evidence supporting two elements of his aggravated burglary conviction.

A party does not need to challenge the evidence's sufficiency at trial to preserve the challenge for appellate review. *State v. Gutierrez-Fuentes*, 315 Kan. 341, 348, 508 P.3d 387 (2022). Appellate courts review sufficiency challenges by viewing all the evidence in the light most favorable to the State to determine whether a rational juror could have found the defendant guilty beyond a reasonable doubt. *State v. Palmer*, 321 Kan. 302, 305, 578 P.3d 97 (2025).

As we engage in the analysis, it is useful to see how the charges operate. The three crimes are nested within one another. First, the State charged Kelly with felony murder.

12

Jury instruction No. 3 outlined the following elements that the jury was required to find, beyond a reasonable doubt:

"1. The Defendant or another killed [Jay];

"2. The killing was done while defendant was committing Aggravated Burglary; and

"3. This act occurred on July 17, 2021, in Sedgwick County, Kansas."

Second, the State charged Kelly with aggravated burglary. Jury instruction No. 4 provided:

"To establish this charge, each of the following claims must be proved:

"1.    The Defendant entered or remained within a dwelling at [Jay's address];

"2.    The Defendant did so without authority;

"3.    The Defendant did so with the intent to commit an Aggravated Assault therein;

"4.    At the time there was a human being in the dwelling;

"5.    This act occurred on July 17, 2021, in Sedgwick County, Kansas.

"The State must prove that the defendant committed the crime of Aggravated Burglary intentionally. A defendant acts intentionally when it is the defendant's conscious objective or desire to do the act complained of by the State.

"The elements of Aggravated Assault are as follows:

"1.    The defendant knowingly placed another in reasonable apprehension of bodily harm;

"2.    The defendant did so with a firearm;

"3.    This act occurred on July 17, 2021, in Sedgwick County, Kansas.

"No bodily contact is necessary."

13

Finally, the State charged Kelly with aggravated assault. Jury instruction No. 5 provided the following elements:

> "1. The Defendant knowingly placed Shaquille Cook in reasonable apprehension of immediate bodily harm;
>
> "2. The Defendant did so with a firearm;
>
> "3. This act occurred on July 17, 2021, in Sedgwick County, Kansas."

With these elements in mind, Kelly argues there was insufficient evidence to support elements 2 ("without authority") and 3 ("with the intent to commit an aggravated assault therein") of the aggravated burglary conviction.

### a. *Without Authority*

Kelly makes two related claims in support of his argument that there was insufficient evidence supporting the "without authority" element. First, Kelly notes that the basis for his knowledge regarding Ben and Kelly's right to be in Jay's house came solely from Ben. And "[g]iven the commanding way [Ben] entered the house through the screen door" it seemed reasonable that Ben was expected.

But Kelly's claim asks us to reweigh the evidence, which an appellate court does not do. See *State v. Pepper*, 317 Kan. 770, 779, 539 P.3d 203 (2023). As noted above, the jury heard several versions of the events. Although Kelly would point to other evidence, the following evidence supports the jury's finding that Kelly entered without permission:

- Ben testified—and commented during his interview—that he and Kelly snuck into the home in order to surprise and scare Jay.
- Ben testified that he did not have permission to enter.
- Ben testified that he never told Kelly they were expected.

14

- Cook, the only adult present at the home, testified that he did not give anyone permission to enter the home.
- Cook testified that he heard Jay say "what the fuck are you doing here, blood" right before the gunshots began.
- Kelly himself testified that no one gave him permission to enter.

Taken together, this testimony and the inferences therefrom readily support the jury's finding that Kelly entered the house without permission. As this court has explained, "even the gravest crime can be proved with circumstantial evidence and the logical inferences properly drawn from that evidence." *Pepper,* 317 Kan. at 779.

On this same element, Kelly contends that he did not enter the house until he heard gunshots, and that "[a] person entering another's house in order to defend another person therein cannot lack authority to enter just because the person causing harm does not provide express permission." He cites an out-of-state case and seems to suggest there should be some exception to this element analogous to a law enforcement officer's emergency aid exception to warrants. But again, his argument depends on a factfinder believing Kelly's account of the events, which would require this court to reweigh the evidence. Viewed in the light most favorable to the State, there is sufficient evidence to support the element that Kelly entered Jay's residence without permission.

b. *Intent to Commit Aggravated Assault*

Second, Kelly argues that there is insufficient evidence that he intended to commit an aggravated assault. But Kelly's argument on this element suffers from the same flaws: he asks this court to reweigh evidence and only consider evidence favorable to himself, i.e., that he only entered the residence after hearing gunshots and did so to aid his friend. But considerable evidence supported that Kelly "went in the house with felonious intent

or that while he remained in the house without authority that he gained felonious intent."
For example:

- Kelly's message stated:  "Just fight if extra mf come I got you g."
- Ben testified that they entered the house together.
- Ben testified that they entered hoping to surprise Jay.
- Ben testified that Kelly joined him in case anyone else was there.
- Ben commented in his interview that Kelly was there "to help me check the dude" and that the goal was to scare Jay and Kelly was going to use the gun to do so.
- Kelly testified he was Ben's backup.
- Kelly testified that he and Jay were in it "50-50."

From this evidence, considered in the light most favorable to the State, a jury could find that Kelly entered the home to help Ben scare Jay, and that Kelly would use the gun to scare anyone they ran into. Kelly did just that by first pointing his gun at Cook and then firing a bullet through Cook's wall. As the State notes, one interpretation of the evidence is that Kelly entered the residence "to support [Ben]'s mission to ambush [Jay]." We conclude there was sufficient evidence supporting this element.

2. *Any error in denying Kelly's requested affirmative defense instructions was harmless.*

Kelly next argues the district court erred by denying his request for affirmative defense instructions.

For instruction issues, the starting point is our familiar four-part *Plummer* test:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v.*] *Ward* [, 292 Kan. 541, 565, 256 P.3d 801 (2011)]." *State v. Milo*, 315 Kan. 434, 438, 510 P.3d 1 (2022) (quoting *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 [2012]).

At the jury instruction conference, Kelly requested a self-defense jury instruction and also discussed how, under his theory, he was operating in defense of another (though without using that specific language). We conclude that Kelly preserved requests for self-defense and defense of others instructions, which he broadly labels "use of force" instructions. See K.S.A. 21-5222(a).

In denying Kelly's requested instruction, the district court began by correctly noting it had "to give the instruction if there's any factual basis that either side has presented that would justify it." Turning to aggravated assault, the court found self-defense was not permitted in relation to Cook because "there is no evidence to suggest that Mr. Cook took any action that would have necessitated Mr. Kelly to use force or deadly force against Mr. Cook." Regarding Jay, the court noted, "There is not really much question that Mr. Kelly and [Ben] went to the house together and that [Ben] entered the house without authorization." Based on this, the court concluded that, under K.S.A. 21-5224, Jay had legal authorization to use force, but not Kelly.

17

When discussing the elements of aggravated burglary, the district court found that a self-defense instruction did not negate felonious intent but observed that defense counsel could still make that argument in closing. Finally, the court discussed *State v. Holley,* 315 Kan. 512, 509 P.3d 542 (2022), and noted that self-defense is not available "to a person who is attempting to commit, committing, or escaping from the commission of a forceable felony, burglary, and aggravated burglary."

This court explained the interaction of self-defense and felony murder in *Milo* and *Holley*. Those cases, decided the same day, clarified that "[s]elf-defense may never be used as a defense to the charge of felony murder." *Milo*, 315 Kan. at 441. That said, "So long as it is legally and factually appropriate, however, self-defense may be asserted as a legal justification absolving the defendant of criminal liability for the underlying inherently dangerous felony." *Milo*, 315 Kan. at 442.

Kelly argues that a use of force defense negates elements 2 and 3 of the underlying inherently dangerous felony of aggravated burglary ("without authority" and "with intent to commit aggravated assault"). See K.S.A. 21-5402(c)(1)(J) (defining aggravated burglary as an inherently dangerous felony).

In *State v. Waldschmidt*, 318 Kan. 633, 646-47, 546 P.3d 716 (2024), this court explained that an aggravated assault instruction included the use of force and could be negated by self-defense. And, though not controlling, a panel of the Court of Appeals has applied a similar analysis to an aggravated burglary charge that was supported by a charge of aggravated battery. See *State v. Flesher*, No. 125,821, 2024 WL 5001992, at *5 (Kan. App. 2024) (unpublished opinion). Taken together, these cases suggest that providing a use of force instruction here was legally appropriate. Whether such an instruction was factually appropriate is complicated by K.S.A. 21-5222 and K.S.A. 21-5223, so we shift our analysis to harmless error.

18

The parties disagree as to the appropriate test, but we need not referee that dispute because we conclude the error here is harmless under even the higher constitutional standard. See *State v. Holley*, 313 Kan. 249, 257, 485 P.3d 614 (2021) (declining to consider which harmlessness standard applied, as the State failed to prove harmlessness under either), *modified on other grounds on reh'g* 315 Kan. 512. Kelly asserts the failure to provide the instruction left the jury no avenue to consider the lawfulness of his actions and tipped the scale toward the State's version of events. But if the jury concluded that Kelly was entering the house to save his friend, the jury could have found that he did not possess the requisite intent to enter the home to put someone in apprehension of bodily harm. This would have eliminated an element of aggravated burglary and undermined the felony murder charge.

Further, Ben told a consistent story—both on the stand and during the police interview that took place hours after the shooting—that Kelly came into the house right behind him. And, as the State notes, the physical evidence—including the number of collected casings and fired rounds—undermined Kelly's story that he ran in after the shooting. Kelly's credibility, on the other hand, was undercut by testimony from two law enforcement officers indicating he gave various false accounts of the events. We conclude that any error was harmless beyond a reasonable doubt and there is no reasonable possibility that the failure to give the requested instruction would have impacted the outcome of the trial.

3. *The prosecutor did not misstate the facts or the law, invade the province of the jury, or vouch for credibility.*

Kelly argues the State committed multiple prosecutorial errors in closing arguments.

We engage in a two-step review of claimed prosecutorial error. First, we consider whether there was error, i.e., whether the prosecutor exceeded their wide latitude in conducting the State's case. We do not consider statements in isolation but look to the context to determine whether error occurred. *State v. Bobian*, 321 Kan. 169, 182, 574 P.3d 385 (2025).

If there is error, the State must show that there is no reasonable possibility that the error contributed to the verdict. We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless. But the strength of the evidence is not our primary focus, and we may find prejudice even in strong cases. *Bobian*, 321 Kan. at 182.

We do not require parties to contemporaneously object to claimed prosecutorial errors to preserve them for appeal, although we may consider whether the parties objected as we assess each error. *Bobian*, 321 Kan. at 182.

    a. *The prosecutor did not misstate the facts.*

Kelly first argues that the State misstated the facts in the following portion of closing argument:

> "So the State's theory, the State would ask you to believe that the defendant and [Ben] entered that house together. They didn't have permission when they did it. They snuck in. The defendant brought a gun. That [Ben] then attacks [Jay] in his room. And the defendant's there to keep other motherfuckers out of it. People like Shaquille Cook. But [Jay], in his own bedroom, in his own house, while he's eating dinner in the middle of the night, defends himself and shots are fired. The defendant shoots [Jay] in return in the chest and then flees with [Jay]'s gun."

20

It is error for a prosecutor to misstate facts. See *State v. Ford,* 320 Kan. 507, 527, 571 P.3d 500 (2025) ("[A] prosecutor errs when arguing a fact or factual inference without an evidentiary foundation."). Kelly asserts that this was a misstatement of the facts, "even the facts given by its own witnesses, in order to drive its narrative about [Kelly]'s actions." But testimony from Ben and Kelly, along with Kelly's text messages, support the idea that they snuck in together without permission and that Kelly was there to make sure the fight was just between Ben and Jay.

Moreover, when understood in context, the prosecutor's statement outlined the State's theory and then explained how that theory aligned with the relevant elements of the charges. Next, the prosecutor outlined Kelly's theory and rhetorically asked, "So how do you unpack all this. Is the State's theory correct, is the defendant's theory correct, or is there something in between[?]" At that point the prosecutor permissibly commented on witness credibility.

Finally, Kelly suggests that the prosecutor ignored his testimony. But this case involves multiple competing witness accounts, each of which had friction in some way with the others. Thus, it was appropriate for the prosecutor to outline the two theories of the case and then comment on the credibility of those providing evidence as a way of providing a framework for the jury's decision-making. *State v. Pribble,* 304 Kan. 824, 835, 375 P.3d 966 (2016) (prosecutors may comment on witness credibility). We discern no error in the challenged statement.

### b. *The prosecutor did not misstate the law.*

Kelly next argues the State misstated the law on aiding and abetting. See *State v. Z.M.,* 319 Kan. 297, 317, 555 P.3d 190 (2024) (prosecutor errs by misstating the law). As Kelly notes, instruction No. 7 required a showing that Kelly "(1) had the same mental

culpability as [Ben] to commit the crime and (2) intentionally aided him in committing it." He asserts the prosecutor committed this error by noting:

"You see this Instruction No. 7, when he agrees to go over there and be the backup, keep other motherfuckers away from [Ben], keep [Ben] from getting his ass beat, he agrees to do that, brings his gun along, these are before [Ben] does as well."

Kelly appears to take issue with the term "backup," implying that he did not really say that at trial. But the relevant testimony reads as follows:

"[Prosecutor]:   If extra motherfuckers come, I got you, friend?
"[Kelly]:        Yeah.
"[Prosecutor]:   So that was the backup plan?
"[Kelly]:        Yes.
"[Prosecutor]:   You are the backup?
"[Kelly]:        If you want to put it as such, you could consider that."

And, even if Kelly had not admitted to acting as Ben's "backup," the entirety of Ben's testimony at trial and comments during the interview hours after the shooting essentially describe Kelly as his backup, even though he never used that word.

Kelly seems to argue that the prosecutor's language is factually incorrect and therefore the State could not prove he shared mental culpability with Ben or had the intent to go into the house and scare Jay. Kelly suggests the facts indicate his going into the house was conditional and would only occur in the event of anyone ambushing Ben. But again, this simply seeks a reweighing of the evidence, and as discussed, there is sufficient evidence to support that Kelly intended to enter the house and commit an aggravated assault.

Further, the prosecutor's statement did not misstate the law of aiding and abetting. The prosecutor referenced instruction No. 7, which Kelly does not argue is inaccurate, and then suggested aiding and abetting occurred when Kelly agreed to go to Jay's as Ben's backup and keep others away from the fight. The prosecutor was thus not describing the law, but rather how the facts of the case fit the law. Evidence supports the prosecutor's position that Kelly and Ben shared culpability for the goal of sneaking into the house and scaring Jay, and that Kelly had the intent to do so. We see no error here.

    c.   *The prosecutor did not invade the province of the jury or vouch for credibility.*

Kelly's final claim of prosecutorial error arises from the State's comments in closing argument about the physical evidence. Kelly argues that the following statement, which followed the prosecutor's discussion of the credibility of various witnesses, invaded the province of the jury and vouched for the credibility of the physical evidence.

> "There's a fourth witness I want you to think about. The physical evidence. The physical evidence isn't biased. It doesn't care about this case. It just is what it is. So I want you to ask yourself, taking all of those witnesses into account, does the defendant's theory add up."

As Kelly notes, the State then discussed the rounds recovered and suggested that, based on this physical evidence, Jay could have only fired two rounds. From this analysis, the State argued the physical evidence suggested Kelly came in with Ben. The State further argued the physical evidence explained the three wounds on Kelly's chest, by suggesting Kelly was shot twice: once as a through and through, and a second time as he was hunched over reeling from the first shot, such that two wounds were caused on his chest as one bullet skipped across it.

23

In rebuttal, the State came back to this point. It noted:

"Now contrast that to the physical evidence. Physical evidence is not bias[ed]. It doesn't have memory problems. It's not related to anybody. It just—just is what it is, right. And here's—here's an example of it is what it is. That 9-millimeter pistol can only have eight rounds in it. And so if more shots were fired, right, or maybe somebody picked up some shell casings in the scene, then somebody would have had to get to that gun and put more rounds in it because we've got the full capacity. Somebody would have had to get under the board and put some more bullets in it. That doesn't make sense. The physical evidence speaks for itself."

Kelly asserts this line of argument is error "because it tells the jury [the physical evidence] has to be trusted above any other evidence, and it tells the jury that physical evidence is inherently more credible tha[n] witness testimony— and [Kelly's] testimony in particular."

The State is permitted to discuss how evidence supports competing theories of the case, which is ultimately what the State was doing here. See *State v. Martinez*, 311 Kan. 919, 922, 468 P.3d 319 (2020) ("On the other hand, prosecutors are given wide latitude in discussing the evidence or the lack of evidence supporting a defense theory."). Further, the State is correct that objective facts in the world (i.e. the location of a shell casing, the number of bullets in a magazine, etc.) are not burdened by the biases or motivations that might accompany a witness' testimony. Because the State is permitted to make reasonable inferences and explain to a jury what it can consider in assessing credibility, *State v. Wash*, 320 Kan. 646, 669, 571 P.3d 568 (2025), it follows that the State can also comment that certain types of evidence do not suffer from similar credibility problems. See *State v. Sean*, 306 Kan. 963, 980, 399 P.3d 168 (2017) ("On the other hand, a prosecutor does not act outside the wide latitude afforded if he or she merely observes that some reasonable inference about witness credibility may be drawn from evidence introduced at trial."). The State stopped short of telling the jury that the physical evidence

24

should be its primary consideration or that it should ignore other evidence. We conclude that the State did not err by arguing that the physical evidence did not support Kelly's theory of defense.

Having concluded that each of Kelly's claims of prosecutorial error fail, we need not move on to evaluate harmlessness.

4. *The district court did not err in admitting Kelly's two interviews with law enforcement.*

Kelly next argues the district court erred in admitting two statements given to law enforcement officers while he was hospitalized. On the State's pretrial motion, the district court held a *Jackson v. Denno* hearing and found the statements admissible. Kelly also objected when these statements were discussed at trial. This issue is preserved for review.

The United States Constitution's Fifth Amendment protection against self-incrimination and the Fourteenth Amendment Due Process Clause require that statements made to government officials are given voluntarily, knowingly, and intelligently. Overreach by police or other state actors—that is, intimidation, coercion, deception, or other misconduct—is a necessary predicate to finding a confession is not voluntary, and there must be a link between the overreach and a defendant's resulting confession to establish the constitutional violation. *State v. G.O.*, 318 Kan. 386, 404, 543 P.3d 1096 (2024).

We have recently referred to examples of techniques that constitute per se coercive conduct, such as extreme psychological pressure or physical harm. *G.O.*, 318 Kan. at 398. But we have also recognized that less onerous police conduct may also overcome an individual's ability to decide freely whether to make statements if the individual has

particular vulnerabilities, either situational or ongoing. 318 Kan. at 399-400. We set out a lengthy, nonexhaustive list of details that might factor into the analysis of whether an inculpatory statement to law enforcement was voluntary:

> "'Potential details of the interrogation that may be relevant include: the length of the interview; the accused's ability to communicate with the outside world; any delay in arraignment; the length of custody; the general conditions under which the statement took place; any physical or psychological pressure brought to bear on the accused; the officer's fairness in conducting the interview, including any promises of benefit, inducements, threats, methods, or strategies used to coerce or compel a response; whether an officer informed the accused of the right to counsel and right against self-incrimination through the *Miranda* advisory; and whether the officer negated or otherwise failed to honor the accused's Fifth Amendment rights.

> "'Potential characteristics of the accused that may be relevant when determining whether the officer's conduct resulted in an involuntary waiver of constitutional rights include the accused's age; maturity; intellect; education; fluency in English; physical, mental, and emotional condition; and experience, including experience with law enforcement.'" *State v. Huggins*, 319 Kan. 358, 367-68, 554 P.3d 661 (2024) (citing *G.O.*, 318 Kan. at 403).

When the protections of the Fifth and Fourteenth Amendments apply, the prosecution must prove the voluntariness of the statement by a preponderance of the evidence. A district court first asks if there was overreach as to the particular defendant by looking at the totality of the circumstances surrounding the statement. *G.O.*, 318 Kan. at 398-401.

We apply a dual standard when reviewing a district court's decision on the voluntariness of a defendant's statement to law enforcement. First, we review the trial judge's findings about historical facts regarding the circumstances of the statements as issues of fact, which must be supported by substantial competent evidence. In doing so,

26

we do not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts. *G.O.*, 318 Kan. at 407. We examine the totality of these factual circumstances and assess de novo the trial judge's legal conclusion based on those facts. This means we give no deference to the trial judge's legal conclusion that Kelly's statements were voluntarily made. *G.O.*, 318 Kan. at 407.

*Statements to Officer Hannah*

Kelly's first interaction with law enforcement occurred right after he entered the hospital. At the *Denno* hearing, Officer Faith Hanna testified that she received a call to meet a shooting victim at the hospital. She met Kelly in the emergency room and began to ask questions while he was being treated by medical personnel. Officer Hanna noted that Kelly was in pain, and that he had what looked like gunshot wounds to his chest. She agreed that medicine may affect a person's ability to give knowing and intelligent answers. She explained that Kelly was not in custody and was not a suspect at that time.

Officer Hanna and her partner questioned Kelly about what happened and who did this. Kelly said he was drinking alcohol and smoking marijuana with friends and that he was shot while on a street as he was walking to his car. He did not know the specific street or who shot him. He noted that he had a "crazy ex." At one point Kelly asked Officer Hanna if she thought he was "going to make it" and held her hand. Kelly seemed to slur his words at points, but he spelled his name and provided his home address. He explained that he drove himself to the hospital and what kind of car he drove. He also explained that he was working on a house earlier in the day. This interaction was recorded on a bodycam and the video was played for the jury. After the video, Officer Hanna waited with Kelly for between two and three hours until he went into surgery.

27

At trial, Officer Hanna testified about her interview with Kelly. She explained that Kelly told her he was shot while leaving a friend's house, that he did not know his friend's name, and that he was not sure where the friend lived. She noted Kelly told her he saw a red vehicle with its lights off and then he felt shot. He never told her that he went into a house.

The district court acknowledged that Kelly was in pain and under the influence of narcotics, but concluded that because he was treated as a victim and not yet a suspect, and questioned in a non-coercive manner, his statements to Officer Hanna did not violate his constitutional rights and could be used as evidence.

*Statements to Detective Chisholm*

Two days later, while Kelly was in the hospital, he asked the patrol officer guarding his door if he could speak to a detective. Detective Robert Chisholm arrived to talk with Kelly. Detective Chisholm explained that he recorded the audio and made a transcript, but those do not appear in the record. During his testimony, Detective Chisholm read several statements word for word from the transcript. He noted Kelly said: "Uh, well, he asked me to help him kidnap him. Okay. And I was like, no. I was like, no, you can go beat his ass by yourself or something man, like." Kelly said this conversation occurred four days prior to the shooting. Kelly also told Detective Chisholm that he entered after hearing shots but that he did not have a gun.

Detective Chisholm described Kelly as propped up in bed and talkative, cooperative, and alert. Chisholm did not see any signs of impairment. Kelly told him that he had been given multiple pain medications but said he felt fine to talk to the detective. Earlier, Kelly had spoken to a different detective (the voluntariness of that interview is not at issue on appeal) and told Detective Chisholm that he was "a little fucked up" in

28

that interview but he was much better and able to talk now. Detective Chisholm read Kelly his *Miranda* rights and Kelly told him about entering the house. Detective Chisholm testified that he did not believe Kelly's medical treatment, including any narcotics, interfered with his ability to answer questions. The interview lasted 42 minutes, at which point Kelly became tired and asked for an attorney. Detective Chisholm then ended the interview.

As to Detective Chisholm, the district court again acknowledged that Kelly was receiving pain medication, but found that Kelly initiated the interview, waived his *Miranda* rights, and explained that he was much better, relatively speaking.

Kelly testified at trial that he did not recall giving any statements to law enforcement while in the hospital. On appeal, he maintains that the statements were not voluntarily made.

Again, we review the district court's findings of fact for substantial competent evidence, the ultimate legal conclusions on voluntariness de novo.

There is substantial competent evidence supporting the district court's findings that Kelly was under the influence of narcotics and/or painkillers during both interviews and that he was suffering from a gunshot wound.

There is also substantial evidence that, in his interview with Officer Hanna, Kelly was treated as a victim rather than a suspect and the officer's questioning was focused on information-gathering. Kelly was able to spell his name, give his home address, articulate a coherent (albeit untruthful) account of what happened, and, though in pain, was able to interact with Officer Hanna and medical personnel following his admission to the hospital. Kelly appeared to be slurring, potentially because of the narcotics, but Officer

Hanna observed Kelly for between two and three hours and testified she did not observe major impairment. See *State v. Galloway*, 311 Kan. 238, 248, 459 P.3d 195 (2020) ("At no time during the interview did Galloway appear disoriented, incoherent, confused, or disassociated from reality" and noting the defendant was untruthful but "the deceit appears to have served the purpose of minimizing her involvement in the killing and does not appear to have been the consequence of confusion or delusion.").

Similarly, substantial competent evidence establishes that, two days later, Kelly affirmatively asked to speak with a detective; Kelly compared his condition to his earlier condition and noted that he was better and able to chat; Kelly acknowledged he was taking pain medication but suggested it did not interfere with his ability to talk; Detective Chisholm testified that Kelly was alert and talkative; and Kelly was able to waive his *Miranda* rights and then assert them later. See *Galloway*, 311 Kan. at 247 ("The interrogating officers specifically asked about drug use and whether Galloway understood their questions and understood what was going on. She did not inform the interrogating officers that she was impaired or unable to understand her circumstances.").

On appeal, Kelly argues the interview with Officer Hanna was involuntary because he was in pain and was impaired by narcotic medication. Kelly argues his statements to Detective Chisholm were involuntary because he was under the influence of narcotics, though he was in less pain than when he was in the emergency room speaking with Officer Hanna.

We are not convinced.

Although a subject's pain and the effects of medication "*could* have come into play in terms of law enforcement overreach," there is no evidence or findings from the district court suggesting that they actually did so here. See *Huggins*, 319 Kan. at 370. And Kelly

30

makes no allegation that the officers offered threats or promises or attempted to mislead him in any way about the purpose of the interviews or the status of their investigation into the shooting. The district court found Kelly was capable of responding appropriately to Officer Hannah's non-accusatory questions, and affirmatively requested to talk with Detective Chisholm, with whom he discussed his mental clarity, waived *Miranda*, attempted to clarify prior statements, and ultimately reasserted his *Miranda* rights. Under the totality of the circumstances, the officers did not overreach in their interviews of Kelly. We affirm the district court's conclusion that the statements were voluntarily made.

5. *The cumulative error doctrine is inapplicable.*

Kelly's final argument is that cumulative error deprived him of a fair trial. But because we identify only one potential error, the cumulative error doctrine has no application. *State v. Mendez*, 319 Kan. 718, 742, 559 P.3d 792 (2024).

Affirmed.

LUCKERT, J., not participating.

31